**SIERRA CLUB, The Chattooga Conservancy, Biodiversity Legal Foundation, Florida Biodiversity Project, Forest Conservation Council, Georgia Forest Watch, Ouachita Watch League, Southern Appalachian Biodiversity Project, Wild Alabama, Wild South, Wilderness Society, and Jerry Williams, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE; Charles L. Myers, in his capacity as Regional Forester of the Southern Region of the U.S. Forest Service; Dale Bosworth, in his official capacity as Chief of the U.S. Forest Service; and Ann Veneman, in her official capacity as Secretary of the U.S. Department of Agriculture, Defendants.**

Civil Action No. 1:03–cv–1230–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 22, 2008.

As Corrected March 3, 2008.

---

Eric Eugene Huber, Sierra Club, Boulder, CO, Donald D.J. Stack, Stack & Associates, Jonathan Lee Schwartz, Jon L. Schwartz, Attorney at Law, P.C., Atlanta, GA, for Plaintiffs.

Pamela S. West, U.S. Department of Justice, General Litigation Section, Washington, DC, Robert David Powell, Assistant U.S. Atty., Northern District of Georgia, Atlanta, GA, for Defendants.

*ORDER*

TABLE OF CONTENTS

I.   INTRODUCTION ................................................1272

II.  CLAIMS I AND II ............................................1274
     A.   Background............................................1274
     B.   Key Interpretive Issues ..............................1288
     C.   Region Eight PETS Lists as of 2002 ...................1290
     D.   Supplementation of the Administrative Record .........1291
     E.   Standard of Review in NEPA Cases .....................1291
     F.   Resolution of Key Interpretive Issues ................1292
     G.   Legal Discussion .....................................1302
          1.  Claim I .........................................1302
          2.  Claim II ........................................1306

III. CLAIM III .................................................1309

IV.  SUMMARY ...................................................1311

V. APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1313
    1. 2002 Regional Supplement to Forest Service Manual . . . . . . . . . . . . . . . . . . . . . 1313
        Digest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1313
        § 2672.43—Procedures for Conducting Biological Evaluations . . . . . . . . . . . . . 1314
        Decision Tree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1315
        Definition of Terms in Decision Tree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1316
    2. List of 2002 Region Eight Forest Plan Amendments . . . . . . . . . . . . . . . . . . . . . . 1316
    3. Claims Made in *Chattooga* and *Forest Conservation* . . . . . . . . . . . . . . . . . . . . . . . 1317

ORINDA D. EVANS, District Judge.

## I. INTRODUCTION

This environmental suit brought under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, *et seq.,* the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.,* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.,* is back before this Court following an appeal. The parties have filed new cross motions for summary judgment. An evidentiary hearing for the purpose of supplementing the administrative record was held on June 8, 12, and 13, 2007. Oral argument on the parties' cross-motions for summary judgment was heard on October 12, 2007. Having considered the administrative record as supplemented and the briefs and arguments of the parties, Plaintiffs' motion is GRANTED IN PART and DENIED IN PART and Defendants' motion GRANTED IN PART AND DENIED IN PART.

Plaintiffs are various environmental organizations which oppose Forest Service projects in the national forests. Defendant U.S. Forest Service is charged with the management of the national forest system. Under the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. § 528, *et seq.,* and the National Forest Management Act, 16 U.S.C. §§ 1600(3) and 1607, the Forest Service must manage the national forests for timber production as well as for recreational and other uses. Specifically, the U.S. Forest Service is required to carry out commercial timber sales in the national forests within the "sustained yield" formula set by the legislation.[1] This reality produces constant litigation between environmental groups and the Forest Service. This case is one instance among many.

This case was initially filed as two cases: *The Chattooga Conservancy, et al. v. Jacobs,* Civil Action No. 1:01–cv–1976–ODE and *Forest Conservation Council, et al. v. Jacobs,* Civil Action No. 1:03–cv–1230–ODE.[2] The original claims in each case are set forth in the Appendix, pp. 1317–18. The two cases were consolidated following the appeal under the above-captioned case name.

The following claims are before the Court on the current cross-motions for summary judgment:

    I.  Claim that the 2000 amendments to the forest plans[3] for Ouachita National Forest (Amendment 31), the

---

**1.** Forest Service activities in the National Forests are not limited to timber cutting. Other activities include wildlife habitat improvement, corridor maintenance, range forage improvement, site preparation for reforestation, and fuels treatment (prescribed burning to avert runaway forest fires).

**2.** Plaintiffs' appeals were consolidated in the United States Court of Appeals for the Eleventh Circuit under the caption *Wild South, et al. and Ouachita Watch League, et al., v. Jacobs, et al.,* No. 05–14461. The opinion is published as *Ouachita Watch League v. Jacobs,* 463 F.3d 1163 (11th Cir.2006).

**3.** The technical name for a forest plan is "land and resource management plan". The term forest plan will be used for ease of reference.

National Forests in Alabama (Amendment 17), and the Chattahoochee–Oconee Forest (Amendment 18) are invalid because of deficient environmental analyses or faulty procedures under NEPA. Plaintiffs seek to stop projects approved under the authority of the 2000 amendments which have not been concluded.[4]

II. Claim that the 2002 Supplements to the 1989–1990 VMEISs for the Ozark/Ouachita, Appalachian and Coastal Plain/Piedmont subregions[5] are invalid because of deficient environmental analysis under NEPA, thereby invalidating certain 2002 forest plan amendments, which were enabled by the Records of Decision ("ROD") for the Supplements.[6] Plaintiffs seek to stop projects approved under the authority of the 2002 amendments which have not been concluded.

III. Claim that the 1999 revised forest plans for the National Forests in Florida and the Kisatchie Forest in Louisiana are invalid because of Defendants' failure to provide a draft of certain proposed changes to members of the public before finalizing the changes. Plaintiff contend this violated NEPA and the APA. Plaintiffs seek to stop projects authorized under the authority of these revised plans be-tween their adoption in 1999 and their amendment in 2002 which have not been concluded.

The Court of Appeals has resolved in Plaintiffs' favor all issues of standing and ripeness. On Claim I and on Claim II administrative remedies have been exhausted. The Court of Appeals did not address claim III in its opinion, but claim III was remanded to this Court for decision. On claim III there is an outstanding issue concerning exhaustion of administrative remedies, which will be discussed in that part of this Order.

The parties disagree as to whether the Court of Appeals resolved all issues of mootness in its opinion. While there is some ambiguity on this point, this Court finds that the Court of Appeals has resolved this issue in Plaintiffs' favor. In any event, while all of the allegedly invalid plan amendments and revisions now have been superceded by further amendments, and all of the timber-cutting authorized under some of the allegedly invalid amendments may have been concluded by now, there are follow-up project activities such as periodic prescribed burning and reforestation which continue for years. The Court of Appeals noted that the continuing follow-up activities make non-moot the issue of faulty environmental analysis of the superceded amendments and revisions. This Court does agree with Defendants, however, that the issue of mootness may

---

4. Plaintiffs make parallel claims regarding the 2000 Amendments in all three forests. This Order will focus first on the claim regarding the 2000 Amendment to the Ouachita Forest Plan.

5. These three subregions collectively make up the Southern Region (Region Eight) of the national forest system.

6. While all of the three 2002 Supplements ("SEISs") and the 2002 forest plan amendments contain the same or similar key lan-guage, the legal analysis required by Plaintiffs' NEPA claims is not necessarily uniform across the board. Some forests adopted new, revised forest plans beginning in 1999. The forest plans revised during or after 1999 did not incorporate the key language from the RODS for the 1989–1990 VMEISs, whereas the earlier revised plans did incorporate that language. The analysis in this Order will focus first on the 2002 amendment (Amendment 35) to the 1990 Ouachita Forest Plan. That Plan was not revised until 2005.

be re-evaluated if new evidence shows that the facts have changed (that all follow-up activities have been completed).

## II. CLAIMS I and II

### A. Background

The factual background has been set forth in the Court of Appeals' 2006 opinion in this case, *Ouachita Watch League v. Jacobs,* 463 F.3d 1163 (11th Cir.2006), and in this Court's predecessor opinions in *Chattooga Conservancy v. Jacobs,* 373 F.Supp.2d 1353 (N.D.Ga.2005) and *Forest Conservation Council v. Jacobs,* 374 F.Supp.2d 1187 (N.D.Ga.2005).

The Court of Appeals' opinions in *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999) and in this case, *Ouachita Watch League v. Jacobs,* 463 F.3d 1163 (11th Cir.2006), provide the controlling legal authority. Preceding decisions of this Court in *Sierra Club v. Martin,* 992 F.Supp. 1448 (N.D.Ga. 1998)(Thrash, J.) and 71 F.Supp.2d 1268 (N.D.Ga.1996) (Hull, J.) provide helpful factual perspective.

A number of key documents are the focus of Plaintiffs' claims (I) and (II). A review of the relevant parts of those documents is a necessary prerequisite to analysis of Plaintiffs' legal claims.

*1990 Vegetation Management Environmental Impact Statement ("VMEIS")*

The 1990 VMEIS for the Ozark/Ouachita Mountains subregion is a programmatic environmental impact statement. [AR 304–306]. It analyzed the foreseeable environmental effects of various alternatives for vegetation management in the subregion.[7] The Summary, p. vi, enumerates five vegetation management methods (*i.e.,* (1) prescribed fire,[8] (2) mechanical methods, (3) manual methods, (4) herbicides and (5) biological methods). The various alternative approaches considered in the VMEIS (labeled as alternatives A–H) represented different selections or combinations of vegetation management methods. For example, Alternative A was the "no action" alternative in which there would be no vegetation management. Alternative D allowed no herbicide use. Alternative F, labeled as the preferred alternative, called for emphasis on manual methods and prescribed fire, with less emphasis on herbicides and mechanical methods. It called for using "herbicides and application methods that pose minimum risk to humans, wildlife, and non-targe [sic] plants.... Mechanical methods cause low to moderate soil disturbance. Prescribed fire is low to moderate intensity. All sorts of manual treatments are done." [AR 304 at p. x].

Chapter I–8 is entitled "Purpose and Need". Section C ("Scope of Decision") states in part: *"This EIS provides analytical data that may be used when making site specific decisions in the future."* (Emphasis added). Section D ("Implementing the Decision") has three parts: 1. Site analysis; 2. Project Design; and 3. Monitoring. The subsection on Monitoring states in full as follows:

---

7. The 1990 VMEIS for the Ozark/Ouachita subregion is a significant work consisting of 373 pages exclusive of lengthy appendices. Its scope and level of detail are impressive. The 1989 VMEIS for the Coastal Plain/Piedmont subregion and the 1989 VMEIS for the Appalachian Mountains subregion are similarly impressive. These three VMEISs are similar in format but substantively are entirely different from each other. Each is based on the unique characteristics of that subregion. All three VMEISs do share certain "key language" pertaining to the protection of PETS in site-specific project areas.

8. Prescribed burning as described in the VMEIS is a low-intensity burning process which is used as a regenerative technique in reforestation. It also is used to create cleared areas which will avert runaway forest fires. [AR 304 at vi].

Monitoring of environmental effects is done during and after treatment to assure that the project is implemented as designed and that mitigation measures are effective. Information gathered may be used to validate or refine treatments or to add further mitigation measures. A full array of treatments in diverse environmental conditions is monitored. Minor projects and those whose effects are already well documented may not be monitored.

Effects of treatments on vegetation, soil, wildlife, and threatened or endangered species are monitored in the treated areas. Effects on water and aquatic life may be monitored onsite and downstream. Effects on air quality may be monitored onsite and downwind.

Monitoring during treatment is important if changes in tools or intensity are needed. Most monitoring is done just after treatment and at appropriate intervals thereafter. Monitoring is seldom needed beyond 3 years after project completion.

Much of the VMEIS is devoted to a comparison of the environmental effects of each of the vegetation management alternatives. While the VMEIS notes the selection of Alternative F as the preferred alternative, the VMEIS itself did not state the final selection of Alternative F or discuss the reason for that selection. This was done in the Record of Decision for the VMEIS, as discussed below.

Chapter II ("Alternatives") first describes each of Alternatives A–H in detail. [AR 304 at II–1 through II–19]. It then describes in detail the "methods and tools" which are available. [*Id.* at II–19 through II–40]. Following that, Section E sets out General Management Requirements and Mitigation Measures, applicable to all vegetation management methods, as follows:

## I. General Management Requirements and Mitigation Measures

The following general requirements and measures apply to all vegetation management methods. *Each forest may be more restrictive, but not less.* (Emphasis in original)

a. *Site Specific Analysis*

(1) Projects must have site-specific analysis in compliance with the National Environmental Policy Act (NEPA). This environmental analysis considers site-specific techniques, intensity of application methods, and potential environmental effects of any method considered. A reasonable range of alternatives, including one which does not use herbicides and a "no action" alternative, is examined.

\* \* \*

The intent of this requirement is to ensure adequate environmental analysis. Congress and the Council on Environmental Quality have recognized the effectiveness of NEPA in developing environmental awareness and protecting the human environment. Monitoring is done through review of site-specific analyses and post-treatment evaluations.

(2) A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy

by a threatened, endangered, proposed, or sensitive species. Appendix D identifies potential adverse effects from vegetation management by species. When adverse effects are projected, mitigation measures specified in appendix D and this chapter are used to prevent them.

Requirements and measures for actions affecting U.S. Fish and Wildlife Service threatened, endangered, or proposed species are detailed in species recovery plans and FSH 2609.23R. Recovery plans have been prepared for the red-cockaded woodpecker, southern bald eagle, northern gald [sic] eagle, gray bat Indiana bat, eastern cougar, Florida panther, American peregrine falcon, American alligator, and the leopard darter. Chapters in FSH 2609.23R have been prepared for red-cockaded woodpecker, southern bald eagle, and American alligator. Requirements and measures for actions affecting sensitive species are detailed in Forest Land and Resource Management Plans.

If it is determined that the project may positively or negatively affect threatened, endangered, or proposed species, consultation is initiated with the Fish and Wildlife Service. If, during informal consultation, it is determined that the project is not likely to adversely affect listed species and the Fish and Wildlife Service so concurs in writing, consultation is terminated. However, if it is determined that the project is likely to adversely affect listed species, formal consultation is initiated. Figure D–1 outlines this process.

When the evaluation indicates that a project may have an adverse effect on a sensitive species or its habitat, appropriate State wildlife agencies, natural heritage commissions, and other cooperators or species authori-ties are contacted to identify coordination measures. These measures are directed towards ensuring species viability and preventing negative population trends that would result in Federal listing.

The intent of this requirement is to protect threatened, endangered, proposed, and sensitive species. Monitoring is done through review of site-specific analyses, onsite inspections, and post-treatment evaluations.

(3) Integrated Pest Management (IPM) principles are used during site-specific analysis. IPM is a decision-making and action process which includes biological, economic, and environmental evaluation of pest-host systems to manage pest populations.

IPM strategies apply a comprehensive systems approach to silvicultural, wildlife, range, fuel treatment, and corridor management practices that emphasizes prevention of pest problems.

* * * *

The intent of this requirement is to ensure use of IPM during project planning. Monitoring is done through review of site-specific analyses, onsite inspections, and post-treatment evaluations.

(4) In each project, water quality is protected from nonpoint-source pollution through use of preventive "best management practices" (BMP's). BMP's are developed by States with EPA review to comply with the Clean Water Act and control nonpoint-source pollution. Implementation of BMP's, monitoring and evaluation of their application and effectiveness, and adjustment of practices as needed are done to protect beneficial water uses.

* * *

The intent of this requirement is to protect water quality and assure compliance with State water quality laws. Monitoring is provided through evaluation of BMP application and analysis of water quality.

[AR 304 at II–40 through II–43].

Chapter II also contains a large number of method-specific management requirements and mitigation measures, *see* II–48 through II–61. These include significant restrictions on the use of prescribed fire and herbicides. In total, there are 87 "management requirements and mitigation measures" listed in Chapter II of the VMEIS. With respect to all of them, it is provided that "Each forest may be more restrictive, but not less."

Chapter III ("Affected Environment") is an in depth discussion of the physiography, climate, vegetation, wildlife, PETS, soils, water, aquatic life, corridors, trails and other features of the Ozark/Ouachita subregion. Chapter IV ("Environmental Consequences") describes the effects of the various vegetative management methods on the forest environment.

The 1990 Ozark/Ouachita VMEIS has a number of appendices. [AR 305]. Appendix A is a risk assessment; Appendix B concerns the effects of prescribed fire on soil and water in Southern national forests; Appendix C concerns the effects of herbicides on soil productivity and water quality. Appendix D of the Ozark/Ouachita VMEIS is entitled "A Biological Evaluation of the Effects of the Final Preferred Alternative on Threatened, Endangered, Proposed and Sensitive Species". It generally discusses potential adverse effects of the vegetation management methods on

threatened, endangered or proposed animals and on sensitive animal and plant species. [AR 305 at D–9 through D–13]. It also names all of the protected species which occur in the subregion and states the effect of each vegetation management method (in the absence of mitigating measures) on a species-by-species basis. [AR 305 at D–14 through D–24]. Not surprisingly, the "vegetation management method" most frequently listed as harmful is herbicides. Appendix D also includes, in Figure D–1 a flow chart ("decision tree") for the "site specific environmental analysis process" which includes the population inventory analysis step. [AR 305 at D–10].

While Appendix D's decision tree is complicated and somewhat obscure, it shows that the project specific population inventory is only one part of the biological evaluation process and that it will not always be necessary to obtain an inventory for a species in the project area.

Appendix D's biological evaluation concludes that the selected mix of "vegetation management methods" in combination with the "management requirements and mitigation measures" would not necessarily be harmful to proposed, threatened, endangered or sensitive species. It notes the requirement of site-specific analysis in determining whether the plans for a particular project would harm PETS. [AR 305 at D–8]. It also notes the requirement of consulting with the U.S. Fish and Wildlife Service when the project "may affect" endangered or threatened species. [*Id.* at D–9].

*ROD for 1990 VMEIS*

The Record of Decision ("ROD")[9] for the 1990 Ozark/Ouachita VMEIS was

---

**9.** A ROD is a concise written rationale by the RFO (Responsible Federal Official) regarding implementation of a proposed action requiring an environmental impact statement. 7 C.F.R. § 650.4(i). It states the decision

which has been made and signals that the decision is final and appealable. 40 C.F.R. § 1505.1; 36 C.F.R. § 215.7. The ROD, not the environmental impact statement itself, is the decisional document.

signed on March 5, 1990, by the Regional Forester. It is a seventeen page document, exclusive of exhibits. [AR 307]. It describes the various methods of vegetation management which were considered in the VMEIS and explains why Alternative F will be implemented. It states that this alternative would "maintain effective plant control and ... stress prevention of vegetation management problems before they occur in order to maintain forest health." [AR 307 at 6]. It explains that Alternative F will use herbicides less than previously, restricted to "least risk" chemicals applied at "lowest effective rates" over fewer acres, and that there will be less use of mechanical methods and that high intensity prescribed fire and high disturbance mechanical tools will be eliminated. Also, there will be "extra mitigation measures that place tighter constraints on how vegetation management projects are analyzed and done". [AR 307 at 6]. The Record of Decision states, "ALL MITIGATION MEASURES REQUIRED BY THIS DECISION ARE IN *EXHIBIT A* OF THIS RECORD AND ARE INCORPORATED HEREIN." [AR 307 at 8]. Exhibit A lists, in slightly truncated format, the 87 general and method-specific mitigation measures from the 1990 VMEIS, including measure (2) pertaining to biological evaluations. The list on Exhibit A does not include the language "Each Forest Plan may be more restrictive, but not less" in relation to the "General Management Requirements and Mitigation Measures". That language is included only as to the "Method Specific Management Requirements and Mitigation Measures". [AR 307 at A–6]. The ROD for the Appalachian Mountains VMEIS is the same in this respect. [AR 107 at A–1]. The ROD for the Coastal Plain/Piedmont VMEIS is different. [AR 207]. It does retain the "more restrictive, but not less" language as to the first four mitigation measures.

The ROD states, "[t]o implement this programmatic environmental impact statement, Forest Plans for the Ozark–St. Francis and Ouachita National Forests are being amended (exhibits B and C) by this Record of Decision".[10] [AR 307 at 16]. Attached to the Record of Decision are Exhibit B (Amendment 4 to the Ozark–St. Francis National Forest Plan) and Exhibit C (Amendment 3 to the Ouachita National Forest Plan). Exhibits B and C indicate the specific page in those forest plans into which certain of the management requirements and mitigation measures were to be incorporated. Amendment 4 to the Ozark–St. Francis Plan included measure (2) pertaining to biological evaluations. Amendment 3 to the Ouachita Plan did not add mitigation measure (2) to the Plan. It noted that mitigation measure (2) was already in the Ouachita Plan. Indeed, the ROD for the 1990 Ouachita Plan [AR 921] stated that it was incorporating "all standards and guidelines and mitigation measures identified in the Vegetation Management EIS and ROD for the Ozark and Ouachita Mountains". [AR 921 at 28]. This is a difference between the Ouachita Plan versus the Alabama and Chattahoochee–Oconee plans. These latter plans, like the Ozark–St. Francis Plan received the original mitigation measure (2) language from forest plan amendments which were enabled by the RODS for the VMEIS. In the case of the Ouachita Plan, mitigation measure (2) came from the ROD for the Ouachita Forest Plan. Amendments 3 and 4 to the 1990 Ouachita Forest Plan each contained a statement that they were not significant amend-

---

**10.** The Ozark–St. Francis and Ouachita National Forests are the only national forests in the Ozark–Ouachita subregion.

ments. No separate environmental analysis was done for them. The environmental analysis in the VMEIS was the environmental analysis for the plan amendments.

Further complicating the picture, the 1990 Amended Forest Plan for the Ouachita National Forest (hereinafter "1990 Ouachita Forest Plan") [11] was itself an amendment to the 1986 Forest Plan. The 1986 Plan [AR 903] contained very little mention of PETS species, no requirement of pre-project site analysis, and no mention of PETS population inventories. This forest plan was accompanied by an environmental impact statement in 1986. [AR 902]. It also was accompanied by a 1986 Record of Decision. [AR 904].

While the 1990 Ouachita Forest Plan technically was Amendment 1 to the 1986 Plan, the body of the 1990 Plan was significantly overhauled and expanded from the 1986 version.[12] The ROD for the 1990 Ouachita Forest Plan adopted the first four mitigation measures described in the 1990 VMEIS. Amendment 3 incorporated the remaining 83 management requirements and mitigation measures into the 1990 Ouachita Forest Plan. The 1990 Ouachita Forest Plan was in effect between 1990 and 2005.[13]

The 1990 Ouachita Forest Plan has considerable references to PETS species in the body of the Plan. On page III–2, threatened/endangered and sensitive species is identified as an issue for forest management. A number of management practices to address the issue are named, including "[c]ooperating with the Arkansas National Heritage Commission, The Nature Conservancy, and the Oklahoma National Heritage Inventory and Universities in surveys to determine distribution and occurrence of threatened, endangered and sensitive plants and natural communities", "[c]onsulting with those agencies in regard to planned activities in areas for which surveys for sensitive species have not been completed", and "[p]articipating in the annual bald eagle survey". [1990 Ouachita Forest Plan at III–2]. The stated forest management goals and objectives include "protect and improve habitat for threatened, endangered and sensitive species of plants and animals", including

(a) Coordinate with private groups, other agencies and institutions to train personnel to recognize threatened, endangered and sensitive species, unique plant associations and natural communities in order to manage habitat suitable for perpetuation and/or recovery of those species.

\* \* \*

(c) Cooperate with state agencies and institutions to protect and maintain sensitive plant and animal species and their

11. The 1990 Ouachita Forest Plan can be found in Tab 1 of the "Common Administrative Record for the Land and Resource Management Plan for the Ouachita National Forest, Civil Action No. 1:03–CV–1230–ODE (N.D.Ga.), Volume 7 of 8 (Submitted by Agreement of the Parties)." For ease of reference, citations to the 1990 Ouachita Forest Plan will be in the following format: [1990 Ouachita Forest Plan at ——].

12. The 1990 Ouachita Forest Plan had its own environmental impact statement and its own ROD, separate and apart from the 1990 VMEIS and its ROD.

13. In 2005 a new, revised plan for the Ouachita National Forest was approved. This is the periodic revision required by NFMA. It is in the record. [AR 918] It is supported by an environmental impact statement [AR 917a], a summary of the environmental impact statement [AR 917b], and a Record of Decision [AR 910]. The Record of Decision states that the 1990 VMEIS and the 2002 SEIS were considered in compiling the 2005 Forest Plan and its environmental impact statement. No part of the 1990 or 2002 documents were incorporated into the 2005 documents.

habitat to prevent population decline and trends toward federal listing.

\* \* \*

(e) Update sensitive species lists and distribution information regularly.

*Id.* at IV–2. Forest wide standards and guidelines, page IV–13, include "[p]erform biological evaluation on all projects to determine possible effects on threatened or endangered species, or on species proposed for such listing, or on sensitive species"; "[a]ssess the adequacy of existing inventories to allow biological evaluations"; and "[u]ndertake inventory work as needed to fill data gaps on the distribution of threatened and endangered species, those proposed for such listing, or sensitive species". *Id.* at IV–13. Some species-specific goals are set forth, *e.g.*,

> In each habitat unit containing a Red cockaded Woodpecker colony site(s) or recruitment stand(s) provide at least 125 acres of pine or pine-hardwood thirty years old or older (of which 50 acres should be 60 years old or older) to meet foraging needs. Foraging habitat connected to the colony or recruitment stand is to be provided within one half mile of each active colony and recruitment stand.

*Id.*

Chapter IV contains "resource summaries" for timber, wildlife and other resources in the forest. Sections on threatened or endangered species (IV–39) and sensitive species (IV–42) discuss the incidence of each protected species within the forest and the type habitat needed by that species. Some references are made to prior species surveys. Some objectives are set out, *e.g.*, "The Ouachita National For-

est population goal is to have fifty active colonies (of Red cockaded Woodpeckers). Management activities are based on recommendations in the Red cockaded Woodpecker recovery plan." *Id.* at IV–40.

Chapter V is entitled "Implementation of the Forest Plan." [1990 Ouachita Forest Plan at V–1]. This chapter has nothing to do with pre-project population inventories for PETS species. Subsection A is entitled "Implementation Direction" and does not mention PETS or inventories. Subsection B, "Monitoring and Evaluation Program", states in part:

> The purpose of monitoring and evaluating implementation of the Forest Plan is to provide the Forest Supervisor with information on progress toward achieving the goals, objectives and standards. Monitoring does not do the inventory tasks. However, administrative reporting, where appropriate, may be considered a normal part of monitoring. Monitoring is to sense that the Forest Plan direction is being implemented and to determine, in conjunction with the evaluation, if that direction continues to be appropriate. . . .

*Id.* Chapter V sets out specific monitoring and evaluation requirements for listed forest activities and resources. Separate monitoring requirements are specified for various resources, including each of the Management Indicator Species.[14] PETS species are not separately listed. *See id.* at V–3 through V–33.

"Monitoring and evaluation" is defined in the 1990 Ouachita Forest Plan's glossary as: "The evaluation on a sample basis of Forest Plan management practices to determine how well objectives have been

---

**14.** Management Indicator Species are no longer involved in this case, as Plaintiffs elected not to appeal this Court's decision rejecting these Management Indicator Species claims. During the period the 1990 Ouachita Forest Plan was in effect, the Forest Service tracked the incidence of Management Indicator Species to measure the health of the national forests. Some of the Management Indicator Species were also PETS species.

met, as well as the effects of those management practices on the land and environment". [1990 Ouachita Forest Plan at GL–6].

Various appendices are attached to the 1990 Ouachita Forest Plan. Appendix A is a "Ten Year Timber Sale Action Plan" which sets timber cutting goals for specified parts of each Ranger District for each year covered by the plan. Appendix B, "Land Ownership Adjustment Plan", describes the various tracts of land within the forest. It notes that of the forest's 2,374,265 acres, 787,345 acres are privately owned. Appendix J lists, among other things, each threatened, endangered and sensitive species which does occur or may occur in the forest, and specifies the Ranger District(s) where each species probably or possibly occurs. [1990 Ouachita Forest Plan at J–6 through J–17].

*Martin decision*

On February 18, 1999, the Court of Appeals decided *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999). This case involved the question whether mitigation measure (2) in the Chattahoochee–Oconee Forest Plan had been correctly applied by the Forest Service in approving certain projects in that Forest. The Court held it had not been applied correctly. The Forest Service had failed to obtain adequate population inventory information before approving the projects. The wording of mitigation measure (2) in the Chattahoochee–Oconee Forest Plan was exactly the same as that in the 1990 Ouachita Forest Plan.

*Amendment 31 to the 1990 Ouachita Forest Plan*

Following *Martin,* the Forest Service decided to alter part of the language of mitigation measure (2) in numerous Southern Region forest plans, including the plan for the Ouachita National Forest. A notice was mailed to 532 individuals, agencies and organization on January 4, 2000, listing two alternative proposals (one of which was a "no action" alternative). Eleven responses were received. An environmental assessment including a biological evaluation were prepared. [AR 914].

The environmental assessment consisted of fourteen pages plus two appendices and a biological evaluation. Appendix A was proposed Alternative 1; Appendix B was entitled "Difference between the Proposed Amendment and the Preferred Alternative." Lastly the biological evaluation for the Preferred Alternative was attached. The biological evaluation listed each of the nine proposed, endangered, and threatened species and each of the 37 sensitive species existing within the Ouachita National Forest, and stated: "The proposed action is a clarification of the BE procedure and involves no ground disturbance. Therefore, the action will not impact PETS species. For each site-specific project, a separate BE will be prepared that evaluates the effects to those species that have the potential to occur within the proposed project area." [AR 914, BE at 3].

The BE's Summary of Determination of Effect said, "[t]he selected alternative for ... [the Amendment] will provide clarification on timing, and amount of inventory needed for proposed, endangered, threatened and sensitive species." [AR 914, BE at 3].

The environmental assessment described the proposed action, including its purpose and need, described and compared the alternatives considered, compared the biological effects of each alternative, and discussed the environmental consequences of each alternative. The discussion of the proposed action's effects on PETS began as follows:

In order to establish if additional site-specific inventory information is needed, the biologist must first determine which PETS species have potential to occur in

the vicinity of the project. A variety of data sources is used to make this determination. These sources include known occurrences from previous surveys and/or presence of habitat for the species in or in the vicinity of the project. Specific sources of inventory data include but are not limited to: (1) Arkansas Natural Heritage Program (ANHP) records, (2) Oklahoma Natural Heritage Inventory records, (3) USDA Forest Service (FS) inventory records, and (4) inventory data from universities and other agencies' records. Additional information considered includes the known range distribution for the species, U.S. Fish and Wildlife Service (USFWS) county lists for Federal and State listed species, species/habitat relationships information, and site-specific habitat information on the availability of suitable habitat on or in the vicinity of the project. The availability of suitable habitat in the project vicinity is determined by using timber stand inventory data (Continuous Inventory of Stand Conditions), topographic maps, aerial photographs, and site-specific knowledge of the area. [AR 914 at 9]. Thereafter, the Environmental Assessment gave examples of how the proposed change would affect various PETS species. Examples of species for which field surveys would always be conducted were PETS plant species (for ground-disturbing projects), Red-cockaded woodpeckers, and bald eagles. [AR 914 at 9–10]. The rationale was that surveys would provide more definite information to improve the determination of effects to these species.

An example of a species for which pre-project surveys would not be required because it would not provide definitive information for excluding the species from the biological evaluation was the Indiana bat. [AR 914 at 10].

Fish, mussels, crayfish and dragonflies were listed as examples of species which were protected by forest plan requirements which were already in place and would, therefore, be a part of the proposed action. [AR 914 at 10]. Therefore, additional surveys would not be needed to protect these species. They would be assumed to be present and would be included in the biological evaluation. [AR 914 at 10–11].

Finally, examples were provided to illustrate the application of the final part of the proposal which was:

Habitat requirements of a PETS species are well known, and there is sufficient evidence that the proposed actions would have only short- or long-term beneficial effects or no adverse effects to PETS species, or that any expected adverse effects of the proposed actions would not likely cause it to become federally listed or to suffer reduced viability.

[AR 914 at 11].

In a Decision Notice and Finding of No Significant Impact dated July 12, 2000 [AR 914a], the Forest Supervisor found that a modified version of Alternative 1 would be selected. He explained the reason for his selection as follows:

I selected Alternative 1 because it best meets the purpose and need (EA, page 6–7) for this change to the Forest Plan. Alternative 1 will make the greatest use (compared with other alternatives considered) of existing data and information on species occurrences, habitat conditions, and species/habitat relationships in determining the level of surveys required (EA, pages 9–12). Although actual field surveys would be required in fewer situations (compared with Alternative 2), the PETS species in question would still be protected under the clarified provisions of Amend-

ment 31. This includes the process that provides mitigation measures for the three situations where surveys would not be needed but PETS species would be assumed to occur in the project vicinity. This amendment would not alter Forest Service responsibilities under Section 7 of the Endangered Species Act.

[AR 914a at 3]. The Forest Supervisor found that Alternative 1 was not a major federal action and that it would not have a significant effect on the quality of the human environment. He found that it would not be a significant change to the Forest Plan, and that the proposed action would not adversely affect endangered or threatened species or their critical habitat. [AR 914a at 4–5]

Amendment 31 [AR 914a] changed the language of mitigation measure (2) in the 1990 Ouachita Forest Plan. It then provided in full:

A biological evaluation of whether, and to what extent, a management action could affect any species federally listed as threatened, endangered, or proposed, under the Endangered Species Act (ESA), or designated by the Forest Service as sensitive, is prepared as part of environmental analysis for project-level decision making. The procedures for biological evaluations are found in Forest Service Manual 2670, *Threatened, Endangered, and Sensitive Plants and Animals.*

During the biological process to identify possible effects, existing available information will be used to determine the PETS species known or expected to occur in the vicinity of the proposed project or likely to be affected by the action. The information considered may include data on species/habitat relationships, species range distribution, and population occurrences developed from past field surveys or observations. Ex-

isting available information considered will also include the amount, condition, and distribution of suitable habitat.

For some PETS species expected to occur in the vicinity of the project, or likely to be affected by the project, additional field surveys conducted in suitable habitat that is potentially affected by the proposed project are desirable to document the presence or absence of these species. These field surveys would be most appropriate if past field surveys are not available for such areas and if they would provide more definitive information to improve the determination of effects to PETS species.

However, there are some PETS species and situations where information to determine potential effects to PETS species may not require field surveys. For these situations, the PETS species in question would be assumed to occur in the area if suitable habitat is present, and effects to the species would be considered in the effects analysis. These situations occur when:

1. There is a low likelihood of detecting a particular species; a field survey probably would not find that species and therefore could not provide definitive information for excluding a species being considered for protection.

2. Established Forest Plan direction or mitigation that effectively protects PETS species expected to occur in suitable habitat in the project vicinity is already in place and is part of the proposed action.

3. Habitat requirements of a PETS species are well known and (a) there is sufficient evidence that the proposed actions would have only short- or long-term beneficial effects or no adverse effects to PETS species or (b) any expected adverse

effects of the proposed actions would not likely cause it to be Federally listed or to suffer reduced viability.

[EAR 914a at 2].

On August 29, 2000, various Plaintiffs, including Sierra Club and Forest Conservation Council, administratively appealed the Forest Supervisor's decision to adopt Amendment 31 to the 1990 Ouachita Forest Plan. [Chattooga AR, Vol. IV Tab 6]. The appeal alleged that the proposed amendment wrongfully attempted to circumvent the decision in *Martin*, in that it limited survey requirements and allowed projects to proceed without relevant information. Therefore, PETS would be injured. They alleged that Amendment 31 was inconsistent with the VMEIS; that the VMEIS had to be supplemented before the Forest Plan could be amended and that the amendment was based on inadequate information. [*Id.* at 4–5].

On November 22, 2000, the Reviewing Officer affirmed the Forest Supervisor's decision. [Chattooga AR, Vol. IV Tab 6]. The decision noted that Amendment 31 would be considered interim Forest Plan direction; the interim direction would only remain in place until the Regional Forester could complete supplementation to the VMEISs and amend the forest plans to clarify the PETS inventory requirements. [*Id.* at 6].

### 1986 Alabama Forest Plan

The Forest Plan for the National Forests in Alabama and its Record of Decision were issued in March 1986. [AR 403, 404]. This Forest Plan, like the 1986 plan for the Ouachita National Forest, had very little mention of PETS species in it. Unlike the situation in the Ouachita National Forest, no revised Forest Plan was issued in 1989–

1999. In January 1989 the Forest Service issued its VMEIS for the Coastal Plain/Piedmont subregion [AR 204, 205, 206] as well as a Record of Decision [AR 207].[15] Exhibit A to the ROD listed 86 mitigation measures which were being adopted by the ROD, including mitigation measure (2) which was worded exactly the same as that in the Ouachita ROD for its 1990 VMEIS. Exhibit B to the 1989 ROD was Amendment 2 to the 1986 Forest Plan for the National Forests in Alabama, which added mitigation measure (2) (and other mitigation measures) to the Alabama Plan. Exhibit C was Amendment 6 to the 1985 Chattahoochee/Oconee Forest Plan which by its terms added mitigation measure (2) to that Plan. The 1989 VMEIS for the Coastal Plain/Piedmont subregion was the environmental analysis for these two plan amendments. No separate environmental analysis was done.

### Amendment 17 to the Alabama Forest Plan

In March 2000 the Forest Service issued Amendment 17 to the Plan for the National Forests in Alabama. [AR 423]. This amendment is analogous to Amendment 31 in the 1990 Ouachita Forest Plan and Amendment 18 to the Chattahoochee/Oconee Plan. The amendment was accompanied by an environmental assessment [AR 424], and a biological evaluation [AR 425]. The biological evaluation for Amendment 17 stated that "[b]ecause no activities will occur as a result of this evaluation no impacts would be considered for this biological evaluation." [AR 425 at 30]. It further stated "[i]n future activities, separate biological evaluations will be prepared for each forest activity and a site-specific analysis will be conducted and consulted on, if appropriate." [AR 425 at 30–31].

---

**15.** The portions of the National Forests in Alabama and the Chattahoochee/Oconee National Forests which currently are relevant to Claim I are in the Appalachian Mountains Subregion.

The Forest Supervisor entered a Decision Notice and Finding of No Significant Impact on March 22, 2000. [AR 426].

On May 1, 2000, the Wilderness Society filed an appeal of the Forest Supervisor's decision. [AR 427]. The arguments made were the same as those made in the Ouachita appeals. On May 19, 2000, the Forest Supervisor issued his decision rejecting the Wilderness Society's appeal of Amendment 17 to the Plan for the National Forests in Alabama. [AR 428].

*The Chattahoochee/Oconee Forest Plan*

The Chattahoochee/Oconee Forest Plan and its Record of Decision were issued in 1985. [AR 503, 504]. That Plan and its environmental impact statement also had very sparse mention of PETS species. As stated above, no revised Forest Plan was issued for the Chattahoochee/Oconee National Forest in 1989–1990. Amendment 6 added the original version of mitigation measure (2) to that Plan in conjunction with the January 1989 VMEIS.

*Amendment 18 to the Chattahoochee/Oconee Forest Plan*

In February 2000 the Forest Service decided to amend the Chattahoochee/Oconee Forest Plan to add Amendment 18 to that Plan. [AR 506]. This amendment is analogous to Amendment 31 of the 1990 Ouachita Forest Plan. An environmental assessment was prepared [AR 507] including a biological evaluation [AR 508]. The biological evaluation said in part: "The proposed action is a clarification of the BE procedure and involves no ground disturbance. Therefore, the action will not impact PETS species. For each site-specific project, a separate BE will be prepared that evaluates the effects to those species on the list that have potential to occur within the proposed project." [AR 508 at 1]. Therefore, no federally listed species would be affected; no sensitive species would be impacted; the amendment would not result in a trend toward federal listing

or a loss of viability of any sensitive species. [AR 508 at 1]. Appendix 1 to the biological evaluation listed the endangered, threatened and sensitive species which were believed to exist in the forest. The Forest Supervisor found, in a Decision Notice and Finding of No Significant Impact issued on February 2, 2000, that Alternative 1 would be adopted and that it would become Amendment 18 to the Forest Plan.

On March 5, 2000, a group of environmental organizations, including Sierra Club, administratively appealed the adoption of Amendment 18 to the Chattahoochee/Oconee Plan. [AR 510]. Georgia Forest Watch also filed an appeal on March 24, 2000. The appeals made the same arguments as those in the Ouachita appeals. On February 2, 2000, the Forest Supervisor issued his decision notice rejecting to the administrative appeals of Amendment 18 to the Chattahoochee/Oconee Plan. [AR 509].

On September 7, 2001, Region 8 of the Forest Service published in the Federal Register a Notice of Intent to Supplement the 1990 Ozark/Ouachita VMEIS and also the two other subregional VMEISs. [AR 309]. This occurred following Plaintiffs' administrative appeals of the 2000 Amendments in which they claimed that the forest plans could not be legally amended without first amending the 1989–1990 VMEISs. The 1989–1990 VMEISs said the mitigation measures in the forest plans had to be "at least as restrictive" as those contained in the VMEISs, and Amendment 31 (and other similar amendments) allegedly were less restrictive than the original version of mitigation measure (2); therefore, Plaintiffs asserted that a mandate of the VMEISs had been violated and Amendment 31 was invalid.

The main purposes of supplementing the VMEISs were to delete the "population inventory information" phrase from miti-

gation measure (2) and substitute other language and to make mitigation measure (2) uniform in the VMEISs and all regional forest plans. [AR 113, 213, 313]. This change did not affect the biological evaluation requirement and did not make any changes in the other "management requirements and mitigation measures". It did not change the various alternative vegetation management methods or the earlier determination of their effects on the environment. The Notice of Intent also stated the Forest Service's intent to add a regional supplement to the Forest Service Manual.

The Notice of Intent was sent to a large number of interested parties, including Plaintiffs. It included a draft of the proposed change to the part of mitigation measure (2) in the VMEISs which contained the population inventory phrase and a draft of the proposed regional supplement to the Forest Service Manual. Over 150 written responses were received and evaluated. The proposed new wording would make mitigation measure (2) read as follows:

A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done by a biologist as part of the site-specific environmental analysis. This evaluation considers all available information on threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area.

In February 2002 the Southern Region of the Forest Service adopted the regional supplement to the Forest Service Manual which had been distributed with the Notice of Intent. It is now in the Forest Service Manual, § 2672.43 ("Procedures for Conducting Biological Evaluations"). [AR 1214 at 3]. This regional supplement added a flow chart (referred to by the parties as a "decision tree") and a statement concerning the purpose of pre-project site inventories, as follows:

2672.43—PROCEDURES FOR CONDUCTING BIOLOGICAL EVALUATIONS

Procedure for Determining When Project-level Inventory for Proposed, Endangered, Threatened, or Sensitive Species is necessary.

Exhibit 1 outlines a procedure for determining when project-level inventory for proposed, threatened, endangered, or sensitive species is necessary.

[AR 1214 at 3].

Reduced to its essence, the decision tree [16] made it clear that the project-specific population inventory is only one part of the biological evaluation process. By working through the decision tree in conjunction with the 2002 Amendment (Amendment 35 in the Ouachita National Forest) it can be determined whether a site-specific inventory will be required.

The regional supplement contained a Digest, which said:

*Digest*

2672.43—Provides guidance to aid in determining when project-level inventory of Proposed, Endangered, Threatened, and Sensitive (PETS) species is necessary. The inventory is only one step of the Biological Evaluation (BE) process. This step does not supercede any of the requirements for project-level Biological Evaluations established in the 2672.4 section of the Forest Service Manual (FSM).

There are important differences between project-level inventory and forest-level population monitoring.

16. The decision tree is included in the Appendix to this Order, p. 1315.

Project-level inventories are conducted to gather information on distribution and numbers of individuals within the area affected by a project. Project-level inventory is usually conducted on a small scale and is used for the detection of PETS species. When properly designed, population monitoring strategies may include project-level inventory data. However, the summation of project-level inventories does not constitute population monitoring. Project-level inventories are not intended to replace forest-level monitoring obligations under FSM 2670.45.

Population monitoring is conducted to gather information on distribution and numbers of individuals within a national forest. Population monitoring is usually conducted on a larger scale and is used to detect change in population size.

Standardization of monitoring and inventory methods is desirable to reflect population trends within and among populations between observers, over time, to achieve repeatability and consistency. The Forest Service Handbook is being supplemented to identify techniques for inventory and monitoring of proposed, endangered, threatened, or sensitive species or species groups.

The Supplemental Environmental Impact Statements ("SEISs") for the three subregional 1989–1990 VMEISs were issued on October 25, 2002. [AR 113, 213, 313]. The SEISs recommended the proposed new mitigation measure (2) language in lieu of the "no action" alternative. They determined that the language change would have no adverse effect on PETS or their habitat and that it would avoid conducting site-specific inventories when inventories would not provide information helpful to evaluating the project's effect on PETS. The SEISs noted, "[t]he change proposed would remove the requirement that site-specific inventories be conducted for every PETS species under all circumstances". [AR 313 at 19]. It stated, "[d]etermination of when project level inventory information should be gathered would be made based on the direction now contained in the new Regional supplement to the FSM 2672". [AR 313 at 3].

Appendix 1 of each SEIS set forth the PETS species list (threatened, endangered and sensitive species) for the subregion as of 2002. Appendix 2 was the biological assessment for each SEIS. It found that the proposed change would not adversely affect PETS, would have no impact on sensitive species, and would not result in a trend toward federal listing or loss of viability of any species within the region. Appendix 3 was a letter of concurrence from the U.S. Fish and Wildlife Service. The letter stated essentially that USFWS agreed with the Forest Service's position that changing the language of the VMEIS concerning population inventory information would have no adverse impact. It did remind the Forest Service of the need to confer with USFWS whenever it appeared that project activities "may affect" listed species or critical habitat. Also, it added:

> In many cases we foresee the need for concurrent site-specific information. It appears to be the Forest Service's intention to require these surveys whenever it will aid in making effects determinations during section 7 consultations.

[AR 113, 213, 313] (bound paper exhibits).

On October 25, 2002, a Record of Decision for each subregional SEIS was signed by the Regional Forester's designate. [AR 114, 214, 314]. Each ROD stated that this decision amended the forest plans for the national forests in the subregion. In other words, the decision in each ROD was implemented by the 2002 amendments to the forest plans.[17] Amendments for the

---

17. The 2002 forest plan amendments are listed in the Appendix to this Order, pp. 1316–17.

forest plans were physically attached to the RODs. The amendment for the 1990 Ouachita Forest Plan was Amendment 35, which replaced Amendment 31. Amendment 35 stated (as did the amendments to the other forest plans) that it was not a significant change to the Ouachita Forest Plan. [AR 314 at 6]. No separate environmental analysis was done for Amendment 35 or the other parallel amendments. The environmental analysis in the SEISs was the environmental analysis for the plan amendments.

### B. *Key Interpretive Issues*

Before turning to the question of whether Defendants' environmental analyses of the 2000 amendment to the Ouachita Plan and the 2002 Supplement to the VMEIS were deficient, the Court must first determine what these documents meant before the changes were made as well as after. This analysis is complicated because of ambiguities at several different layers of the analysis. In the first place, the population inventory provision in mitigation measure (2) of the 1990 VMEIS and the 1990 Amended Ouachita Forest Plan is itself ambiguous. The word "inventory" and the term "population inventory information" are not expressly defined in any of the pertinent documents. Neither the VMEIS, the 1990 Ouachita Forest Plan, the Forest Service Manual, the Forest Service Handbook nor the Regional Guide for the Southern Region [18] provide a definition. Further, the term "adequate" in the phrase "adequate population information" in the 1990 Ouachita Forest Plan is ambiguous was well. The question is, adequate for what purpose?

The next level of ambiguity which creates difficulty is that the Court of Appeals' holdings in *Martin* and in *Ouachita* are

unclear in certain respects. *Martin* held that the Forest Service did not have adequate population inventory information for PETS in that case. Over 30 sensitive species (almost all plants) occupied the project sites. Both sides agreed the plants would be harmed by the project activities. The Forest Service argued that nonetheless the projects should proceed because the viability of the sensitive species was not threatened; the species existed in other locations. To support its argument the Forest Service pointed to maps obtained from the Georgia Natural Heritage Program ("GNHP") which purported to show population occurrence data for the relevant species in other locations. Also, it pointed to CISC studies which showed the availability of suitable habitat for those species outside the project areas. The Court of Appeals noted that the GNHP maps had been redacted to such a degree that they were useless; the CISC studies only showed the availability of habitat which *could* support the species. There was no actual population data to support the Forest Service's conclusion that the species existed outside the project area in sufficient numbers to sustain viability. That made the decision approving the projects arbitrary and capricious.

That part of *Martin* is clear. It required no interpretation of measure (2) pertaining to biological evaluations. It was a determination that the evidence was insufficient to sustain Defendants' position.

What is not clear is whether the Court of Appeals' rejection of habitat information in the foregoing context also meant that habitat information could not be relied on to show that there is a "high potential" that PETS reside within or around the project site. Also, it is not clear whether

---

**18.** Between 1984 and 2001, the Regional Guide for the Southern Region was the Forest Service's official guide for land and resource management planning efforts in the Southern Region. [AR 1201].

under *Martin* population occurrence data had to be obtained when the selected vegetation management methods were determined not to be harmful to the particular PETS in or around the project area.

Under the original version of mitigation measure (2) the determination of whether there is a "high potential" that PETS inhabit the project site is a critical step. Together with species known to inhabit the project site, it defines the set of species which will and will not be the subject of the biological evaluation. The biological evaluation then will determine whether the relevant "vegetation management methods" would harm PETS which are known to inhabit or which have been determined to have a high potential to inhabit the project area. Plaintiffs' view appears to be that *Martin* bars consideration of a particular species' range and habitat requirements to determine whether that species has high potential to inhabit the project area. Instead, Plaintiffs appear to argue that the decision has to be based on actual population data obtained from either prior field surveys or new field surveys conducted in and around the project site area. In Defendants' view this sometimes would result in useless field surveys. In some cases it would be clear that certain species could not exist in the site either because the species would be outside its range or because the habitat offered by the site is unsuitable.[19] Conducting a field survey for that species would be guaranteed to be fruitless. Defendants also point out that in other cases a field survey's results would be unreliable because the species is hard to detect due to its small size or its reclusive nature; a field survey which netted a total of zero would not be a reliable indicator of the absence of that species. Consideration of range and habitat might be a more reliable indicator in a particular case. Where range and habitat conditions for a particular species are met (or if a prior survey has shown the species' presence), the species would be projected to exist in the area and would be included in the biological evaluation. The species could not be excluded just because it was not found in a field survey. The biological evaluation then would determine whether any PETS known or assumed to be present in the project area would be harmed by the proposed vegetation management methods.

A further ambiguity in the *Martin* decision is whether it applies to all PETS, or only to sensitive species. While the Court of Appeals' holding in *Martin* referred to PETS ("We consequently hold that the Forest Service's failure to gather population inventory data on the PETS species occurring or with a high potential to occur within the project areas is contrary to the Forest Plan . . . ."), the discussion preceding the holding referred only to sensitive species. *Martin*, 168 F.3d at 4–5. The same ambiguity appears in the Court of Appeals' *Ouachita* decision. See *Ouachita*, 463 F.3d at 1176 ("[A]t a more basic level, the forest plans required the Forest Service to keep data on sensitive species.").

Finally, there is a significant issue as to the intended purpose of original mitigation measure (2)'s "population inventory information" phrase. Plaintiffs obliquely assert in their summary judgment briefs that the intended purpose was to facilitate forest-wide, periodic monitoring of PETS species to establish population trends for each protected species. In *Ouachita* the Court of

---

19. In 2002 there were 79 threatened, endangered and sensitive species in the Ouachita National Forest, raising the possibility that there would have to be field surveys in the project area for all 79 species if species range and habitat requirements of the species could not be considered to narrow the group.

Appeals referred to "the PETS monitoring provision". However, Plaintiffs have never raised this as an issue for decision, either by this Court or the Court of Appeals. Because this characterization has important substantive implications in this case, this Court elects to consider it although the parties have not expressly addressed it.

### C. *Region Eight PETS Lists as of October 2002* [20]

As of October 2002 the following threatened and endangered species believed to exist in the **Ouachita National Forest** were: four bird species (piping plover, bald eagle, red cockaded woodpecker and least tern), one fish (leopard darter), one insect (American burying beetle), one mammal (Indiana bat), four mollusk species, one plant (Harperella/ptilimnium nodosum), one reptile (American alligator). Sensitive species believed to exist in the **Ouachita National Forest** were: three amphibian (all salamander species); one bird (peregrine falcon); four crustacean (all crayfish species); seven fish species; two mammal species (both bats); eight mollusk species; thirty vascular plant species. [AR 313 at Appendix 1].

The 2002 list of PETS species believed to exist in the **Ozark–Ouachita subregion** was: (1) *threatened and endangered species*—four bird, two crustacean (both crayfish species), two fish, one insect, three mammal (all bat species), six mollusk, three plant, one reptile (an alligator species), one snail, (2) *sensitive species*—six amphibian (all salamander species), three bird, five crustacean (all crayfish species), ten fish, two insect, three mammal (all bat species), eleven mollusk, one isopod, thirty-nine vascular plant species. For the **Coastal Plain/Piedmont subregion,** the 2002 list was as follows: (1) *threatened and endangered species*—four amphibian (two salamander, one toad and one frog species), seven bird, seven fish, two insect (one butterfly and one beetle species), seven mammal (one wolf, one panther, one cougar, two bat, one manatee, and one black bear species), thirteen mollusk, twenty-nine plant, four reptile (one each alligator, snake, tortoise, and skink species), and three snail species; (2) *sensitive species*—seven amphibian (one amphiuma, three salamander, one waterdog, one frog and one newt species), four bird, nineteen crustacean (all crayfish species), twenty-eight fish, twenty-seven insect, six mammal (two bats, one each muskrat, mouse, squirrel and bear species), thirty-three mollusk, two "other invertebrate" (one each amphipod and clubtail species), eleven reptile (six snake, one tortoise, one turtle, two lizard, and one cooter species), ten non-vascular plant, and two hundred and eight vascular plant species. [AR 213 at Appendix 1]. For the **Appalachian Mountains subregion,** the 2002 list was as follows: (1) *threatened and endangered species*—one amphibian (salamander species), one arachnid, two bird, seventeen fish, six mammal (three bat, one cougar, and two flying squirrel species), forty-four mollusk, thirty-eight plant, two reptile (both turtle species), seven snail species; (2) *sensitive species*—nine amphibian (eight salamander and one waterdog species), four bird, ten crustacean (eight crayfish, one slater and one scud species), thirty-seven fish, forty-eight insect, seven mammal (three bat, one vole, two shrew, and one black bear species), forty-five mollusk, thirty-four "other invertebrate", mostly centipede millipede and other spider species, one reptile (a turtle species), seventy-two non-vascular plant, and one hundred and forty-six vascular plant species. [AR 113 at Appendix 1].

---

**20.** There were no "proposed" species in Region Eight in 2002.

**D.** *Supplementation of the administrative record*

■ "The focal point for judicial review of an administrative agency's action should be the administrative record." *Alabama–Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir.2007) (internal quotations and citations omitted). The Eleventh Circuit has identified circumstances, however, in which it is appropriate for a court to look outside the administrative record. *Preserve Endangered Areas of Cobb's History v. United States Army Corps of Engineers*, 87 F.3d 1242, 1246 n. 1 (11th Cir.1996). For example, a court may find it necessary to supplement the administrative record when: 1) an agency's failure to explain its actions frustrates judicial review; 2) it appears that the agency relied on materials not contained in the record; 3) technical terms or complex subjects must be explained; or 4) there is a strong showing of bad faith or improper behavior on the part of the agency. *Id.*

In the instant case the Court finds it both necessary and appropriate to consider testimony not contained in the administrative record as to the meaning of the terms "inventory" and "population inventory information". Consideration of this testimony is compelled because of these terms' technical nature. A discussion of the Court's conclusion as to the meaning of these terms is discussed below in section F.

**E.** *Standard of review in NEPA cases*

■ NEPA cases are reviewed under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). A court applying this standard must not substitute its judgment for that of the agency. *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, this standard affords a reviewing court "very limited discretion to reverse an agency's decision." *City of Oxford v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir.2005). However, the reviewing court has a duty to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. Agency action will be set aside:

> if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. A reviewing court must " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Id.* (quoting *Bowman Transp. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

In the context of NEPA, a reviewing court must ensure that the agency took a "hard look" at "the environmental consequences of its proposed action." *Sierra Club v. United States Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002). "The agency need not have reached the same conclusion that the reviewing court would reach; the agency must merely have reached a conclusion that rests on a rational basis." *City of Oxford*, 428 F.3d at 1352. Should a court find deficiencies in the agency's process or reasoning, it "may not rectify them or provide a reasoned basis for the agency decision which the agency itself has not articulated." *Sierra Club*, 295 F.3d at 1216. Instead, except in rare instances, the court must remand the action to the agency. *Id.*

**F. *Resolution of Key Interpretive Issues Meaning of the terms inventory and population inventory information***

■ It is impossible to believe that the Forest Service, as author of the VMEISs and the forest plans, intended to require of itself a head count or census of all protected species in the forests, or even in a project area, as a condition precedent to each project. The Forest Service could not have intended to require that its employees obtain head counts of fish, beetles, mollusks, snakes, snails, butterflies, toads, frogs, lizards, salamanders or crayfish, for example. Furthermore, with respect to threatened and endangered species, it is not necessary to have numerical data; harming even one individual is prohibited. Therefore, as discussed in *Chattooga Conservancy v. Jacobs,* 373 F.Supp.2d 1353, 1373–74 (N.D.Ga.2005), the Court rejects Plaintiffs' suggestion that inventory means "the quantity of goods or material on hand." (*See* Plaintiff's Memorandum in Support of Summary Judgment in *Forest Conservation,* page 25, footnote 5).[21]

At the evidentiary hearing held on June 8, 12 and 13, 2007, representatives of the Forest Service testified to their practices in conducting field surveys to obtain inventory information on PETS. Evidentiary Hearing Transcript ("Evid.Hg.Tr.") at 152–368.

The witnesses included George A. Bukenhofer, Regional Program Manager Threatened, Endangered and Sensitive Species. He testified to how he trains biologists to conduct biological evaluations for projects, Evid.Hg.Tr. 158–180, how the 2002 decision tree works, *id.* at 192–197, the preparation of the 2002 SEIS and the decision tree, *id.* at 197–200, how a project level inventory is done, *id.* at 201–203, the inventory methods used for different species, *id.* at 202–205, 207–208, and the difference between project level inventory and forest-wide monitoring, *id.* at 205–206.

Stephen H. Shively, Wildlife Biologist for the Calcasieu Ranger District, testified to his use of the Natural Heritage databases, *id.* at 228, conducting an inventory for the Louisiana–Pearly Shell mussel, *id.* at 229–230, surveying for the Red-cockaded woodpecker, *id.* at 232–233, surveying for the Bachman's sparrow, *id.* at 233–234, surveying for the Louisiana Pine Snake, *id.* at 234–238, the use of thinning, tree marking and prescribed burning to enhance the environment for the Red-cockaded woodpecker, *id.* at 238–243, and use of the 2002 decision tree, *id.* at 252–257.

Paris E. Griep, Wildlife and Fishers and Rare Plant and Range Program Manager for the Florida Forests, testified concerning a sample project in Florida (a Red-cockaded woodpecker habitat improvement project) *id.* at 272–277, the rarity of the Eastern Indigo Snake, *id.* at 278–279, clues in locating gopher tortoises, *id.* at 279–280, surveying for the Calvert's Emerald Dragonfly, *id.* at 280–281, the purpose of prescribed burning, *id.* at 284–286, and preparing a biological evaluation, *id.* at 286–301.

Other witnesses were Dr. Wilson T. Rankin, a Zone Botanist in the Nantahala National Forest, *id.* at 307–343; Dr. Robert E. Bastarache, a District-wide Biolo-

---

21. The Court notes the statement of Plaintiffs' counsel at oral argument that Plaintiffs had not intended to suggest that population inventory information necessarily meant a count of each species. He stated that a count should be expected in the case of a species such as an eagle. Transcript of October 12, 2007 oral argument at 9. In that regard, the Court notes that the USFWS recovery plan for the bald eagle (a threatened species) probably contains monitoring requirements that call for not only counts, but locational identification. It is also noted that the relative size and visibility of the bald eagle is the exception, not the rule, in the Region Eight list of PETS.

gist in the Ouachita National Forest, *id.* at 344–365; and Robert W. Wilhelm, *id.* at 366–385.

The most important thread running through the witnesses' testimony was that population inventory information is the end result of field surveys in which either Forest Service personnel or others walk through a specified area to determine whether a species of interest is present or not. The idea is not necessarily to obtain a total count of that species, but to record population occurrences or the lack thereof. The technique which is used in some cases (presumably with plants) is an actual visual identification, but in many instances other procedures are used. For example, some birds are identified by their sounds (songs) at preset locations far enough apart to distinguish between different birds. For the Louisiana Pine Snake, direct observation is impossible because the snake lives underground 90% of the time. *Id.* at 237. Estimates are made based on mounds of dirt which identify the burrows in which the snakes live. The assumption is that for every two holes (entry and exit) there is one snake. Sampling techniques are used for fish and insects. Where Red-cockaded woodpeckers live in natural tree cavities (generally 55–70 feet from the ground), the nests' locations are identified by telltale sap marks which appear on the trees.[22] Forest Service personnel do not climb the trees to check the nests. Even with black bears, determining the presence of the species is not necessarily based on visual identification. The presence of the bear is recorded based on tracks, unique scratch marks on trees, or bear scat. In looking at the list of PETS species for the three subregions comprising the Forest Service's Southern Region, there are very few protected species (except presumably plants) which would be amenable to a sim-

ple visual identification and a reliable count. That is what this Court meant in *Chattooga* in saying that obtaining inventories necessarily involves some estimating techniques. *Chattooga Conservancy*, 373 F.Supp.2d at 1374. This Court did not mean that "inventory" could be based only on habitat information as in *Martin.*

The testimony of both sides' witnesses showed that in conducting a field survey to obtain inventory information, the range and habitat of the species under consideration is routinely considered. Testimony of Dr. Timothy P. Spira, Evid.Hg.Tr. at 17, 18, 41; testimony of George A. Bukenhofer, *id.* at 103; testimony of Steven H. Shively, *id.* at 236 (Louisiana Pine Snakes live in certain type of soil), *id.* at 246 (bald eagles nest near large bodies of water); testimony of Dr. Robert E. Bastarache, *id.* at 349 (In Oklahoma, Indiana Bat has only lived in one cave location). Ruling out consideration of habitat would lead to illogical results. For example, one would not look for fish, mussels or crayfish on dry land. Also, concentrating survey efforts in the areas which have the capacity to support the species makes sense, particularly when the species is very tiny or reclusive. This does not mean that habitat is a *substitute* for a field survey, as *Martin* prohibited; it only means that a species' habitat range and requirements are considered in determining which PETS will be the subject of a field survey in a particular area. Finally, an assumption of the presence of a PETS species in the project area (when range and habitat conditions are met) to determine which PETS will be the subject of the biological evaluation errs on the side of over-inclusion. This is protective of PETS.

Based on the evidence, the Court also finds that the Forest Service routinely re-

---

**22.** Once natural cavity trees are identified they are marked with bands of white paint. This is required by the recovery plan for the Red-cockaded woodpecker.

lies in part on state-run Heritage Programs for population occurrence data on rare species, including federally protected proposed, endangered, threatened and sensitive species. Dr. Wilson T. Rankin, who has been employed by the Forest Service since 2002, previously worked for the Ohio Department of Natural Resources in its Heritage Program division; before that he worked for the State of Mississippi's Heritage Program. He testified that Heritage Programs are mostly state-run programs that collect and maintain data on the locations and populations of rare species throughout that state. The data banks created by the Heritage Programs are available to government agencies and on a more limited basis to members of the public; the Forest Service uses them as a resource. Dr. Rankin testified that when he conducts a biological evaluation for plants he first obtains a map of the project area. His next step is to look to the state Heritage Program database to see what relevant plant occurrences in the area have been reported. After that, he conducts field surveys over a period of several days. The project is broken up into discrete activity units between 25 and 50 acres each. He takes notes concerning the protected plant species he sees in areas where "we expect ground disturbing activities". Evid.Hg.Tr. at 318. Following the field survey he reports the information back to the Heritage Program and prepares his report for the Forest Service. Evid. Hg.Tr. at 321.

The record shows that the Ouachita National Forest has a large amount of population data for PETS species besides data which is collected in connection with specific projects. During the time the 1990 Ouachita Forest Plan was in effect (until 2005), the Forest Service representatives in the subregion [23] conducted many general-purpose field surveys (i.e., surveys not connected to a particular project but seeking data for certain species) within the Forest, which are documented in the record.[24] See, e.g., Bald Eagle nesting success survey, 1999–2000 [Vol. 19, Tab 27a][25] ; Indiana bat Survey Summary, 1995–2000 [Vol. 20, Tab 31]; Reproductive patterns of five plethodontid salamanders from the Ouachita Mountains, Dec. 1990 [Vol. 20, Tab 45]; Letter concerning 1991 survey results for paleback darters, 1991, [Vol. 20, Tab 47]; Status review of paleback darter with Ouachita NF concurrence 1991 [Vol. 20, Tab 48]; Past and present distribution of the red-cockaded woodpecker and its habitat in the Ouachita Mountains in Arkansas, 1991 [Vol. 20, Tab 51]; Survey of the freshwater mussels of the South Fourche LaFave River and major tributaries 1992 [Vol. 20, Tab 57]; Range extension of the paleback darter, 1993 [Vol. 20, Tab 58]; Survey for the American Burying Beetle in Scott County, Arkansas, Oct. 1992 [Vol. 20, Tab. 60]; Survey of the American Burying Beetle in the Ouachita National Forest of Arkansas, Dec. 1992 [Vol. 20, Tab. 61]; An endangered species status report: Ptilimnium nodosum [Rose]

---

**23.** Some surveys were conducted in conjunction with the U.S. Fish and Wildlife Service, state program representatives, university representatives or others. These surveys were not forest wide. They were aimed at those parts of the forest where habitat for the particular species existed.

**24.** The Court cannot determine whether the surveys in the record represent all or a part of the Ouachita National Forest general survey

data during the relevant time frame. In any event, it is a substantial amount of data. The record does not contain similar data for other forests, except what is reflected in environmental assessments and biological evaluations for site-specific projects.

**25.** The surveys referenced are in the original *Forest Conservation* (Wild South) pleadings files, Volumes 19 through 23.

Mathias in Arkansas, Jan. 1993 [Vol. 20, Tab 63]; Mussels of the Phase III Ecosystem Management Project watershed (Alum Fork, Saline River drainage, Arkansas), 1993 [Vol. 20, Tab 68]; Leopard darter surveys—1992/1993, Ouachita National Forest, Oklahoma and Arkansas, 1993 [Vol. 20, Tab 69]; Ouachita madtom feeding habits and population estimates, 1993 [Vol. 21, Tab 70]; Status review of long-nose darter, 1993 [Vol. 21, Tab 71]; Studies of the Endangered American Burying Beetle—Tiak District, ONF, 1994 [Vol. 21, Tab 76]; Habitat transect survey of the Endangered American Burying Beetle … on the Ouachita National Forest 1994 [Vol. 21, Tab 78]; Microhabitat and population analysis of Lampsilis powelli (Lea, 1852) in the South Fork Ouachita River, Montgomery County, Arkansas, 1994 [Vol. 21, Tab 79]; Survey of the freshwater mussels of the Poteau River drainage in Arkansas, 1994 [Vol. 21, Tab 80]; Survey for Arkansas wheeleri and other rare unionids in the Tiak District, 1994 [Vol. 21, Tab 82]; Distribution and abundance of Lythrurus snelsoni (Robison), an endemic species from the Ouachita Mountain Uplift, 1994 [Vol. 21, Tab 82]; Leopard darter surveys, Ouachita National Forest, Oklahoma and Arkansas, 1994/1995 [Vol. 22, Tab 88]; Survey of Ptilimnium nodosum, Sept. 1996 [Vol. 22, Tab 91]; Distribution and habitat of the leopard darter in the Cossatot River State Park and Natural Area and the Ouachita National Forest, Arkansas with a discussion of the fishes of the CRSPNA, 1996 [Vol. 22, Tab 94]; Glover River Mussel Survey, 1996 [Vol. 22, Tab 98]; Crayfishes of the Ouachita National Forest, Arkansas, 1997 [Vol. 22, Tab 99]; Leopard Darter surveys, Oklahoma and Arkansas, 1996–1997 [Vol. 22, Tab. 105]; Field records for 1998 leopard darter surveys, 1998 [Vol. 22, Tab 106]; Ouachita madtom metapopulation dynamics in intermittent Ouachita Mountain streams, 1998 [Vol. 22, Tab 107]; The Endangered American burying beetle, *Nicrophorus Americanus Olivier* at the edge of its range in Arkansas, Dec. 1998 [Vol. 22, Tab 111]; *Polymnia cossatotensis* report, 1998 [Vol. 22, Tab 112]; Status of three plethodontid salamanders from the Ouachita National Forest of southwestern Arkansas, Dec. 1998 [Vol. 22, Tab 113]; Survey of Ptilimnium nodosum (Rose) Mathias, Aug. 1999 [Vol. 22, Tab 114]; Field forms of 1999 leopard darter surveys plus draft sheet on 1992–1999 totals, 1999 [Vol. 22, Tab 115]; Survey of the Saline River and tributaries for the Alabama shad, 1999 [Vol. 22, Tab 116],-Occurrence and distribution of juvenile Alabama shad in the Ouachita and Little Missouri Rivers of Arkansas in 1999, 1999 [Vol. 22, Tab 117]; *Polymnia cossatotensis* report, 1999 [Vol. 23, Tab 121]; *Petilimnium nodosum:* Arkansas status report 2000, 2000 [Vol. 23, Tab 124]; Additional surveys for the Endangered species Harperella in the Ouachita Mountains Region [Vol. 23, Tab 125]; Conservation Assessment *Cypripedium kentuckiense* Reed on the Ouachita and Ozark–St. Francis NF's, 2000 [Vol. 23, Tab 126]; Mussel Survey of the Mountain Fork River, 2000 [Vol. 23, Tab 127]; Crayfishes of the Ouachita National Forest, Arkansas and Oklahoma, 2000 [Vol. 23, Tab 129]; Field records for the year 2000 leopard darter surveys plus e-mails with population estimates on Broken Bow Reservoir project conducted jointly with USFWS, USFS and ACOE, 2000 [Vol. 23, Tab 130].

The biological evaluations and environmental assessments pertaining to specific projects which were challenged in this case show that the Forest Service uses prior, general survey data in determining whether PETS are likely to be present in areas where projects are planned. *See Chattooga Conservancy,* 373 F.Supp.2d at 1362–65 (Wildhorse Creek project); 1365–66 (Oliver Branch project); 1378–82 (biological

effects analysis for the Indiana bat and the American Burying Beetle).

While the record does not contain the recovery plans prepared by the U.S. Fish and Wildlife Service for the threatened and endangered species which inhabit the Ouachita National Forest, or the monitoring reports required by the recovery plans, both the 1990 VMEIS and the 1990 Ouachita Forest Plan contain considerable information concerning the locations and numerical estimates of threatened and endangered species. (*See* discussion of 1990 VMEIS and 1990 Forest Plan above at pp. 6–12, 16–19, 45–48). The Court infers that part of this information came from monitoring done pursuant to the requirements of the recovery plans.

In summary, the Court finds that species "population inventory information" as that term is used in the 1990 VMEIS and the 1990 Ouachita Forest Plan meant population occurrence data gathered from both pre-project and general purpose field surveys ( *i.e.*, not connected to a particular project but seeking data for certain species), population occurrence data drawn from monitoring[26] threatened and endangered species pursuant to recovery plans, population occurrence data from state Natural Heritage Programs, which is available in map format, and similar data from other sources, including universities and citizens' groups. Population inventory information for a specific project did not mean population totals for each species present.

The Court also finds that the collection of population occurrence data, whether for site-specific surveys or other field surveys, appropriately includes consideration of range and habitat of the species which is the subject of the field survey.

Furthermore, this Court finds that the Forest Service did possess and did keep a very large body of population occurrence data for PETS in the Ouachita National Forest during the time the 1990 Ouachita Forest Plan was in effect, which was obtained independently of the site-specific surveys which were done for projects. It also had access to the Natural Heritage survey information, which was extensive. The Court also finds that all of the population occurrence data which was available to it was routinely used by the Forest Service to determine the species which would be the subject of the biological evaluation in each site-specific project.

*Meaning of "adequate"*

■ A further ambiguity in the phraseology chosen by the Forest Service is the word "adequate" in Amendment 3 ("adequate population inventory information"). The question is, adequate for what purpose? Given that mitigation measure (2) concerns the requirement of a biological evaluation to determine effects on potentially affected PETS, the Court finds that adequate means "adequate to determine what species should be the subject of the biological evaluation for the project". Because the 1990 VMEIS and the 1990 Ouachita Forest Plan both make it clear that mitigation measure (2) is intended to protect PETS from being harmed by project activities, the Court finds that "adequate" in a more general sense also means "sufficient to protect PETS in a project area from harm from the vegetation management methods being used".

*Meaning of Martin and Ouachita*

*Martin* established that under the original version of mitigation measure (2), habi-

---

26. It is unclear from the record whether data collection for threatened and endangered species is done by the Fish and Wildlife Service, by the Forest Service, or both. Either way, it is clear from the record that the Forest Service possesses the data as it is referenced in the VMEIS, the Forest Plan, and in the Monitoring and Evaluation Reports.

tat information could not be a substitute for population occurrence data in determining that a sensitive species existed in sufficient abundance outside the project area to sustain its viability. It also established that when there is a high potential that PETS occupy a given area, population occurrence data for those PETS must be collected to verify whether or not they occupy the site. *Martin* did not hold that habitat information could not be relied on to determine which species have a high potential to occupy the project area.

■ This Court concludes that under *Martin* habitat information (and consideration of a species' range) is permissible to determine which species should be included in a field survey seeking population occurrence data. Any other approach would lead to surveys for a species which could not possibly occur (*e.g.*, fish on dry land).

*Ouachita* further pointed out that under the 1990 Forest Plan the Forest Service had a duty to keep sensitive species data, not just collect PETS data. That obligation may equally be implied from numerous other provisions of the 1990 Ouachita Forest Plan, not just from the mitigation measure (2) language quoted in *Martin*. *See* pages 15–17 above for relevant plan excerpts. Furthermore, the evidence before the Court shows that the Forest Service did collect and maintain substantial population occurrence data on PETS in the Ouachita National Forest during the time the 1990 Ouachita Forest Plan was in effect. It also had access to the National Heritage database, which the Court infers was extensive.

Because *Martin* stressed the fact that PETS in that case (mostly sensitive species) would be harmed by the project activities, *Martin* can be read as limited to those situations where the project activities would pose a risk of harm to the PETS in question. In other words, once

the set of species which has high potential to occur in the project area has been determined, a field survey is not necessarily required under *Martin* if the project methods would not harm the species in question. However, because *Martin's* stated holding does not expressly include this factor, this Court will not assume that it did.

*Whether Martin applies only to sensitive species*

As previously stated, *Martin's* factual discussion centered on sensitive species, but the ruling appears to encompass proposed, endangered and threatened species as well. Similarly, *Ouachita* focused on sensitive species but its ruling covered other PETS as well. This Court will assume that the broader interpretation is controlling, but will note here the differing legal protection which is afforded to these two groups.

There is no statutory protection for sensitive species. *But see Inland Empire Public Lands v. United States Forest Service*, 88 F.3d 754 (9th Cir.1996) (holding that the Forest Service's NFMA duty to provide for the diversity of plants and animals in the National Forests, 16 U.S.C. § 1604(g)(3)(B) requires protection of sensitive species). There is no regulation which requires the Forest Service to keep data on sensitive species. *Martin*, 168 F.3d at 5. The protection for sensitive species comes only from the Forest Service Manual, plus any additional protection which may be derived from the provisions of a particular Forest Plan.

Sensitive species are defined as "those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by: (a)significant current or predicted downward trends in population numbers or density or (b) significant current or predicted downward trends in habitat capabil-

ity that would reduce a species' existing distribution." Forest Service Manual § 2670.5(19) [AR 1206]. Regional Foresters are obligated to identify the sensitive species occurring within the Region. Forest Service Manual § 2672.11 [AR 1206]. The Forest Service Manual states that "sensitive species must receive special management emphasis to ensure their viability and to preclude population trends towards endangerment that would result in the need for Federal listing." Forest Service Manual Section 2672.1 [AR 1206]. There is nothing in the Forest Service Manual which addresses inventories of sensitive species.

The legal protection for threatened and endangered species is entirely different from that for sensitive species. The Endangered Species Act, 16 U.S.C. § 1532 *et seq.* requires the Secretary of the Interior to designate those species which meet the statutory definition of threatened and endangered. 16 U.S.C. § 1533(a)(1). A supplemental designation may be made by the Secretary of Commerce. 16 U.S.C. § 1533(a)(2). These designations establish protected status nationwide, not regionally. Once designation occurs, the Secretary is required to publish lists of the protected species including a statement of their range, over what portion of their range they need protection, and their critical habitat. 16 U.S.C. § 1533(c)(1). The Secretary "shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The Secretary is required to develop and implement recovery plans for the conservation and survival of the species, unless he finds that such a plan will not promote the conservation of the species. 16 U.S.C. § 1533(f). The statute defines what must be in each plan. 16 U.S.C. § 1533(f). These elements include:

— "a description of such site-specific management actions as may be nec-

essary to achieve the plan's goal
. . . .

— objective, measurable criteria which, when met would [cause the species to be removed from the list]."

16 U.S.C. § 1533(f).

The statute requires the Secretary to report to Congress every two years "on the status of efforts to develop and implement recovery plans for all species listed . . . and on the status of all species for which plans have been developed." 16 U.S.C. § 1533(f)(3). While the record in this case does not include the text of the recovery plans for any of the endangered or threatened species which are believed to live in the Ouachita National Forest, it is inferable from references in the Forest Plan that the recovery plans have significant substance and require counts of species, creation of favorable habitat when necessary and appropriate, and specific monitoring measures.

The original version of mitigation measure (2) specifically recognized that recovery plans had been established for threatened and endangered species believed to exist or which may exist in the Ouachita National Forest. (*See* pp. 1279–81 above). The Forest Plan also stated where these species occur, their range and habitat requirements, and gave numerical population estimates for those within the forest. [1990 Ouachita Forest Plan at IV–39 through IV–42].

■ Finally, the Endangered Species Act prohibits the taking (harming) of any threatened or endangered species. 16 U.S.C. § 1538. It is not merely the diminution of the threatened and endangered species which matters as with sensitive species; the harming of even *one* individual protected by the Act is prohibited.

*Whether the population inventory provision in original mitigation measure (2) was intended to facilitate forest-wide monitoring of species*

Plaintiffs have suggested that the PETS inventory language in original mitigation measure (2) was intended to create a forest-wide data bank of population numbers for each PETS species. They suggest that this databank could then be used to monitor population trends. They argue that the substituted Amendment 31 language (and similarly the Amendment 35 language) reduced the number of field surveys which otherwise would have to be done and thereby undermined the informational purpose of original mitigation measure (2). Plaintiffs' theory is not expressly articulated in their briefs but is put forward by frequent reference to the "PETS monitoring provision" and by stressing the informational value of PETS inventories to the Forest Service and to Plaintiffs' members. Plaintiffs also called two witnesses at the June evidentiary hearing whose testimony, in part, was offered to further this theory.

Plaintiffs' theory is given some support by *Martin's* discussion of data on sensitive species which was lacking in that case. The Court of Appeals referred to the lack of "baseline population data from which to measure the impact that their destruction in the project areas would have on the overall forest population". *Martin,* 168 F.3d at 4. Plaintiffs apparently draw from this reference the idea that the Court of Appeals intended to require that the Forest Service maintain a census or head count of each PETS species existing in the forest so that any diminution caused by a project could be measured against the census total. However, this theory is flawed. In the first place, *Martin* contains no such holding. As discussed previously, *Martin* held that habitat data was not an acceptable substitute for population data where

the issue was the viability of a sensitive species; it also held that the forest plan required the Forest Service to keep data on sensitive species. The general holding was the following: "We consequently hold that the Forest Service's failure to gather population inventory data on the PETS species occurring or with a high potential to occur within the project areas is contrary to the Forest Plan and, therefore, that the decision to approve the timber sales without considering this information is arbitrary and capricious". *Martin,* 168 F.3d at 4. None of these holdings mandate acceptance of Plaintiffs' theory. Finally, as previously noted there is no need to measure diminution of proposed, threatened or endangered species against a forest-wide population database. A taking of even one individual is prohibited.

While the original version of mitigation measure (2) may have had the incidental effect of augmenting the population data for PETS which was available from other sources, it is clear from the Forest Plan itself that mitigation measure (2) was intended to protect PETS in the project area. That is the very point of having a biological evaluation done before approving a project. There is no construction of the Forest Plan which supports Plaintiffs' theory. Plaintiffs' briefs mention various excerpts from the VMEIS which relate to the need for "monitoring". These excerpts are unrelated to monitoring PETS populations.

The fact that forest-wide "monitoring" is not the intended purpose of a project survey is actually borne out by the Forest Plan's express provision for forest-wide monitoring of various resources, which omits forest-wide monitoring requirements for PETS. *See* [1990 Ouachita Forest Plan at V3 through V33]. Furthermore, the term "monitoring and evaluation" is a defined term in the Plan. It means: "The

evaluation of a sample basis of Forest Plan management practices to determine how well objectives have been met." *Id.* at GL–6.

While the 1990 Ouachita Forest Plan did not require it, the Forest Service did prepare annual reports, designated as "annual monitoring and evaluation reports", which summarized the results of field surveys done that year for threatened, endangered, proposed and sensitive species. In some cases these reports made statements concerning whether the species populations appeared to be increasing or decreasing. *See* [Vol. 25, Tab 22]. The most complete information provided in the 2002 report was for the Red-cockaded woodpecker, a threatened species, as follows:

> Monitoring and data collection for the red-cockaded woodpecker are among the most intensive conducted on the Forest. Each of the adult and young birds are banded, nests are monitored, and habitat conditions are evaluated regularly. From 2000 to 2001, the number of active clusters increased from 22 to 27, and the number of adult birds increased from 51 to 57. There were 24 nesting attempts that produced 40 fledglings. The overall health of the population appears to be improving gradually.

[Vol. 25, Tab 22].

At the evidentiary hearing held on June 8, 12 and 13, 2007, Plaintiffs called as witnesses Dr. Timothy P. Spira, who appeared in person, and Dr. John W. Terborgh, who testified by video deposition. Dr. Spira and Dr. Terborgh were among a group of biologists who had signed letters to the Forest Service dated October 9, 2001 and May 6, 2002 [AR 111] commenting negatively on both the draft 2002 SEIS and the draft 2002 Regional Supplement to the Forest Service Manual. The 2002 letter stated in part, "information on proposed, endangered, threatened and sensitive (PETS) species distributions on the forest has not been collected—either forest-wide or on a project site—and thus is not available for evaluation of the proposed project.... Addressing these problems will require a commitment to monitoring species populations...." [AR 111 at 60–61].

Both Dr. Terborgh and Dr. Spira are learned biologists who gave sincere testimony. Dr. Terborgh holds a Ph.D. in biology from Harvard University. Prior to his retirement he was a James B. Duke Professor at Duke University. Dr. Spira holds a Ph.D. in botany from the University of California at Berkeley and currently is a professor at Clemson University where he teaches field botany and plant ecology. In the summer of 1978 he worked for the Forest Service. Both men are experts in their fields. Both of them have spent time in numerous national forests in the Southern region. The problem with the above-quoted statement in the letters they signed and the similar testimony they gave at the hearing is that neither one of them proffered actual knowledge of the nature or extent of PETS data possessed by the Forest Service. They both assumed that the Forest Service's sole or primary source of PETS data was pre-project surveys. Further, they both admitted that they had no knowledge of the factual accuracy of a number of the assertions made in the letters, which had been supplied to them for signature by the Southern Appalachian Forest Coalition. Therefore, to the extent their testimony was offered to establish that reduction in project field surveys would frustrate forest-wide monitoring, it is rejected as lacking a proper foundation.

Obviously, project area field surveys do produce information concerning the presence or absence of particular PETS species; this is "monitoring" of PETS in the project area. However, the direct, intend-

ed use of this information is to protect PETS in the project area. It is not to obtain a count of PETS either project-wide or forest-wide.

*Meaning of the three versions of mitigation measures (2)*

None of the three versions of mitigation measure (2) is a model of clarity. The original version of mitigation measure (2) uses the term "population inventory information" which has an obscure meaning. The Amendment 31 version is loosely constructed. The Amendment 35 version does not itself refer to how the decision tree and Amendment 35 work together. To understand the connection one must view the Amendment side by side with the 2002 decision tree. Nonetheless, the Court finds that the meaning of each version can be determined.

Taking into account this Court's determination of the meaning of "inventory population information" and "adequate", as well as the Court of Appeals' rulings in *Martin* and *Ouachita*, this Court makes the following determinations. The meaning of original mitigation measure (2) was:

> The biological evaluation must include any PETS species which a previous field survey has shown to be present in the proposed treatment area. If the site has high potential for occupancy by other PETS species (based on considerations of the species' range and habitat requirements), field surveys must be done to determine which of these species are present or not present.

The meaning of Amendment 31's version of mitigation measure (2) was:

> The biological evaluation will include PETS known or expected to occur in the vicinity of the proposed project or likely to be affected by the project activities. To make the determination of which species are "expected to occur in the vicinity" or "likely to be affected by the project activities", a particular species'

range and habitat requirements, population occurrence data from prior field surveys and the habitat offered by the project area may be considered. For some of those PETS, additional field surveys will be desirable to determine whether the species are present in and around the project areas, particularly if past field surveys are not available for the areas and if new surveys would provide more definitive information to improve the determination of effects to PETS species. However in some situations the PETS species in question may be assumed to be present if suitable habitat is present, and will be included in the biological evaluation. These situations are: (1) there is a low likelihood that a new field survey will detect the species; (2) effective mitigation measures for the project will protect any PETS that are present; (3) the proposed actions will not harm PETS, or adverse effects will not cause the species to be federally listed or to suffer reduced viability.

Therefore, the shift from original mitigation measure (2) to Amendment 31's mitigation measure (2) was that in the latter version the Forest Service did not need to gather additional population occurrence data for a species expected to occur in the project vicinity in three situations. Rather, the Forest Service could assume the presence of the species and evaluate the effects of the project methods on the species in the biological evaluation. The other change was that while the original version of mitigation measure (2) called for the biological evaluation to include all PETS having a "high potential" to occur in the project area, the Amendment 31 version required the biological evaluation to include PETS "known or expected to occur in the vicinity of the proposed project or likely to be affected by the project activities".

The meaning of Amendment 35's version of mitigation measure (2) was:

> To determine the species which will be the subject of the biological evaluation, use Amendment 35 in conjunction with the decision tree set forth in § 2672.43 of the Forest Service Manual. Using all available information on PETS (including consideration of habitat and range) and the habitat in the proposed treatment area, go step by step through the decision tree for each species. Where application of the decision tree so indicates, assume the species is present and analyze expected effects. Where application of the decision tree yields the determination that a site-specific inventory for a species is needed, conduct a field survey to determine the presence or absence of that species.

Amendment 35 when considered in combination with § 2672.43 was similar in substance to Amendment 31 though dissimilar in format. Amendment 35 required proposed endangered and threatened species and sensitive species to be processed through the decision tree to determine which species would be the subject of the biological evaluation[27] and which species would require a site-specific inventory.

## G. LEGAL DISCUSSION

### 1. *Claim I*

Administrative remedies have been exhausted as to all aspects of Claim I. The Court turns to consideration of the merits, and will initially focus on the 2000 Amendment to the 1990 Ouachita Forest Plan. Plaintiffs argue that the 2000 Amendment (Amendment 31) for the 1990 Ouachita Forest Plan was invalid because of improper procedures or deficient environmental analysis under NEPA. They assert that revised mitigation measure (2) in Amendment 31 was different (less protective of PETS) from the original version of mitigation measure (2) which was in the ROD for the 1990 Ozark/Ouachita VMEIS.[28] Plaintiffs first argue that the difference in language should have been addressed by supplementing the 1990 VMEIS and its ROD before adding Amendment 31 to the 1990 Ouachita Forest Plan. They argue that in the absence of this action, Amendment 31's approval violated the following NEPA regulation:

> Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation ... and other conditions established in the environmental impact statement or during [the agency's] review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency.

> The lead agency shall:

> (a) Include appropriate conditions in grants, permits or other approvals.

> (b) Condition funding of actions on mitigation.

> * * *

40 C.F.R. § 1505.3.

Plaintiffs cite a number of cases in support of their first argument, including *Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir.2000); *Tyler v. Cisneros*, 136 F.3d 603, 608 (9th

---

27. Many PETS would be ruled out by consideration of habitat and range which is the first juncture of the decision tree.

28. In reality, the 1990 ROD for the Ozark–Ouachita VMEIS was not the vehicle by which original mitigation measure (2) was added to the 1990 Ouachita Forest Plan. Amendment 3 was enabled by the 1990 ROD for the VMEIS but Amendment 3 did not add mitigation measure (2) to the Forest Plan. Both sides' briefs assumed incorrectly that it had. Instead, the ROD for the 1990 Ouachita Forest Plan adopted mitigation measure (2).

Cir.1998); *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir.1992); *Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir.1985).

In response, Defendants argue that there is no legal support for Plaintiffs' claim that failure to supplement the VMEIS before amending the Ouachita Forest Plan violated NEPA. They also argue that the environmental assessment which supported Amendment 31 to the Ouachita Forest Plan was a sufficient environmental analysis regardless of what was in the 1990 VMEIS and its ROD. The Court will address both parties' arguments in turn.

First, Plaintiffs cite *Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir.2000), *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir.1992), and *Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir.1985), for the simple principle that 40 C.F.R. § 1505.3 "is binding on all federal agencies." While this may be true, the previously cited cases do not address the heart of Plaintiffs' claim. To the contrary, Plaintiffs' ultimate conclusion that amending the Ouachita Forest Plan without first supplementing the VMEIS violated NEPA is not supported by these cases. Even read in conjunction with the other cases cited, Plaintiffs' argument simply does not hold water.

Plaintiffs also cite *Tyler v. Cisneros*, 136 F.3d 603 (9th Cir.1998), for the proposition that the Forest Service must comply with mitigation measures in the VEMEISs, including the PETS inventory requirement. In *Cisneros*, a group of San Francisco, California homeowners living near a low-income housing project sued the Department of Housing and Urban Development (HUD), the City of San Francisco, and others under the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA). 136 F.3d at 605. Plaintiffs sued when Defendants

did not comply with the terms of a "Memorandum of Agreement" ("Agreement") between the parties which was designed to mitigate the housing project's impact on the plaintiffs' homes. *Id.* In holding that HUD had continuing authority under the Agreement, the *Cisneros* court construed NEPA regulation 40 C.F.R. § 1505.3 to require an agency to implement a mitigation measure once it had committed to do so. *Id.* at 609. The application of § 1505.3 derived, however, from the plaintiff homeowners' Agreement with HUD and the other defendants. Significantly, the court noted that "HUD had continuing authority over the project because the Agreement provided that: If any of the signatories to this Agreement believes that the terms of this Agreement cannot be carried out ... that signatory shall immediately notify the other signatories and request consultation to amend this Agreement." *Id.* (internal quotations omitted). Plaintiffs' reliance on *Cisneros* is, therefore, misplaced; i.e., the circumstances in *Cisneros*, namely the plaintiffs' Agreement with the defendants, distinguish it from the facts of this case.

Even if the Court construes the cases cited by Plaintiffs in the light most favorable to their argument, Plaintiffs' claim is still not supported by the law. In other words, the Court would be required to make quite an analytical leap from the proposition that § 1505.3 imposes a duty on the Forest Service to comply with mitigation measures to the conclusion that amending the Forest Plan without first amending the VMEIS violates NEPA.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), further casts doubt on Plaintiffs' position. In *Methow Valley*, the Supreme Court held that NEPA did not require the Forest Service to incorporate a fully developed mitigation plan in

its environmental impact statement. 490 U.S. at 359, 109 S.Ct. 1835. The Court also clarified that "NEPA merely prohibits uninformed—rather than unwise agency action," and "imposes no substantive requirement that mitigation measures actually be taken." *Id.* at 351–53, 109 S.Ct. 1835.

In summary, Plaintiffs' argument is not supported by the cases they cite and it is undermined by *Methow Valley,* which indicates that mitigation measures—while considered in the environmental impact statement—do not need to be detailed explanations of specific measures to be employed. The flexibility conceived in this schema does not counsel in favor of Plaintiffs' rigid amendment argument.

Even if a substantive NEPA cause of action is cognizable in some circumstance, the Court observes that the mitigation measures listed in the 1990 Ozark/Ouachita VMEIS and ROD were added to the Ouachita Forest Plan in 1990. Thereafter, any cause of action for failing to enforce the mitigation measures could be brought under NFMA, not NEPA, in connection with any projects which did not conform to the Forest Plan. There is no need to recognize a NEPA cause of action for this purpose. A NEPA cause of action would be superfluous.

■ Neither would the Forest Service's power to amend or revise the forest plans be cut off by an arguably conflicting provision in the RODs for the VMEISs. The Forest Service could still amend or revise the forest plans (in fact, the Forest Service is statutorily required to revise the forest plans at least every fifteen years), subject to an *appropriate* environmental analysis. Therefore, this Court finds that the efficacy of Amendment 31 turns on whether its

environmental assessment was adequate. The Court turns to Plaintiffs' second argument—that the environmental assessment was inadequate and therefore the Forest Service's approval of Amendment 31 was arbitrary and capricious.

■ While Plaintiffs' Claim I is brought only under NEPA, NFMA requirements are relevant. Where a proposed project violates a federal statute (including NFMA) NEPA approval is inappropriate. 5 U.S.C. § 706(2)(A); 40 C.F.R. § 1508.27(b)(10). NFMA requires that a significant amendment to a forest plan be supported by an environmental impact statement, not just by an environmental assessment. 36 C.F.R. § 219.10(f). Plaintiffs argue that Amendment 31 (and the other relevant 2000 Amendments) was a significant amendment which required an environmental impact statement; therefore, this NFMA violation also violated NEPA.[29]

In the case of the 2000 Amendments to the Ouachita, Alabama and Chattahoochee/Oconee Forest Plans, the Forest Service prepared an environmental assessment and a biological evaluation. It concluded based on those documents that the proposed amendments would have no effect on PETS or on the environment. Accordingly, no environmental impact statement was required. Plaintiffs assume that because the 1989–1990 VMEISs and RODs were the source of the mitigation measure (2) language, only another environmental impact statement (or a supplement to the original environmental impact statement) could change the mitigation measure (2) language in the forest plans. However, Plaintiffs overlook that the mitigation measure (2)

---

**29.** In addition, NEPA requires an environmental impact statement for "major federal actions significantly affecting the quality of the human environment". 42 U.S.C.

§ 4332(2)(c). Plaintiffs do not argue that the 2000 Amendment process violated NEPA in this respect.

language was only a small part of the VMEISs and the forest plans. The Court does not depreciate the importance of the mitigation measures—in fact, the VMEISs said they were "the heart" of the VMEISs. [AR 104–106; 204–206; 304–306]. But all of the VMEISs contained a large number of mitigation measures (87 in the Ozark/Ouachita VMEIS, 99 in the Appalachian VMEIS, and 85 in the Coastal Plains/Piedmont VMEIS). Virtually all of these mitigation measures were incorporated, by one means or another, into the forest plans. The 2000 forest plan amendments changed the language of only mitigation measure (2), so as to broaden the group of PETS which would be included in the biological evaluation, while reducing the number of project surveys which otherwise would have been required. Within the overall context of the forest plans this was a small change, especially given that it did not expose PETS to a greater risk of harm.

It is also relevant that the VMEIS/RODS and forest plans required a further, project-specific environmental analysis before any projects could go forward. In this manner, a determination of whether any PETS would be harmed could be made based on a particularized assessment of project site conditions, the chosen vegetation management methods, and the vulnerabilities of any particular PETS which either were present or which were assumed to be present. The fact that this further analysis existed meant that it was not necessary for the 2000 Amendments' biological evaluations and environmental

assessments to consider all possible fact combinations which could occur in a future project. It was enough to determine that the language change in mitigation measure (2) would, generally, have no effect on PETS.

Accepting that mitigation measure (2)'s purpose was to protect PETS in and around the project area, Amendment 31 did as good a job as the original language of mitigation measure (2), if not better. Amendment 31 called for the biological evaluation to include those PETS "expected to occur or likely to be affected by the project" as opposed to those with a "high potential" to exist in the project area. Amendment 31 was more inclusive as to PETS which would be considered in the biological evaluation, and therefore more restrictive (i.e., more protective of PETS) than the original version of mitigation measure (2). This conclusion has two implications: first, it reinforces the conclusion that Amendment 31 was not a significant change; an environmental assessment was an appropriate vehicle for the environmental analysis. Second, it means that there was no need to supplement the VMEIS. Even if the ROD [30] for the 1990 Ozark/Ouachita VMEIS had contained the statement that mitigation measure (2) in the forest plan could be "more restrictive, but not less" (which it did not[31]), revised mitigation measure (2) (Amendment 31) was "as restrictive" as the original version of mitigation measure (2) in that it was equally protective of PETS.

---

**30.** The ROD is the decisional document, not the VMEIS itself. 40 C.F.R. § 1505.2. While the environmental impact statement may inform the reader as to the meaning of the ROD, the impact statement itself is in the nature of a study, not a decision.

**31.** The ROD for the Appalachian Mountain subregion VMEIS [AR 107] also did not in-

clude the "more restrictive, but not less" language as to the site specific mitigation measures. Therefore, this language was not added to the forest plans in that subregion. The ROD for the Coastal Plains/Piedmont subregion did include it. Therefore, so did the amendments to the forest plans in that subregion. [AR 207].

In arguing that the environmental analysis for Amendment 31 was deficient, Plaintiffs stress the fact that it did not "mention the VMEIS" or the fact that there was a discrepancy between mitigation measure (2) in Amendment 31 and mitigation measure (2) in the 1990 VMEIS. However, the environmental assessment for Amendment 31 quoted the entirety of original mitigation measure (2) which had been in the 1990 VMEIS and compared it with two other proposals, one of which was a no action proposal. While the language which the Decision Notice adopted and which became Amendment 31 was not precisely that of any of the alternatives discussed in the environmental assessment, the various alternatives were adequately discussed and compared and the language chosen in the ROD was similar to that of Alternative 1.

The environmental assessment for Amendment 31 specifically noted that the amendment was needed because of the holding in *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir.1999). This Court does believe that in retrospect, the Forest Service decided that the "population inventory information" phrase in mitigation measure (2) was ill chosen, a conclusion with which this Court readily agrees. The term is ambiguous. It is easily understood as meaning "a total count of a particular species in a certain area". However, the Forest Service intended the meaning to be "the sum of population occurrence data in a certain area". The idea was not to obtain a total count of a particular species in the project area but to determine whether that species' presence in the project area could be safely ruled out. The Forest Plan itself bears out this intention.

The environmental assessment stated that Amendment 31 would reduce the number of project specific surveys which would otherwise be required. It also stated that this would have no effect on the well-being of PETS in and around the project areas, because these PETS would be considered in the biological evaluation. This was indeed the bottom line on the Amendment 31 change, and it was correctly pointed out in the environmental assessment. The environmental assessment covered the important considerations such that the Forest Service's conclusion cannot be characterized as arbitrary and capricious.

In summary, the Forest Service's determination that Amendment 31 was not a significant amendment was not arbitrary and capricious. The difference in meaning between original mitigation measure (2) and the Amendment 31 version was not that great. Amendment 31 protected PETS at least as well as original mitigation measure (2), if not better. Furthermore, in both cases the Plan required a further site-specific, fact specific analysis of the effects on PETS in a particular project area. The Forest Service's conclusion that the change would have no effect on PETS was not arbitrary and capricious.

The Court adopts the same reasoning and reaches the same conclusions as to Amendment 17 to the Forest Plan for the National Forests in Alabama and Amendment 18 to the Chattahoochee–Oconee Forest Plan.

For the foregoing reasons, the Court rejects Plaintiffs' Claim (I), finding that Plaintiffs have failed to prove a viable claim under NEPA for a) failing to supplement the 1990 VMEIS before adding Amendments 17, 18 and 31 to their respective forest plans or b) failing to make an adequate environmental analysis of these amendments.

### 2. *Claim II*

Administrative remedies have been exhausted as to Claim II. The Court turns to consideration of the merits.

Plaintiffs claim that the 2002 Supplements ("SEISs") to the 1989–1990 VMEISs violated NEPA because the SEISs: (1) did not include a proper statement of purpose and need as required by 40 C.F.R. § 1502.13; (2) failed to address the environmental implications of a connected action, namely, the "decision tree" added to the Forest Service Manual at § 2672.43, as required by 40 C.F.R. §§ 1502.4 (2007) and 1508.25(a)(1)(ii) and (iii) (2007); (3) failed to consider a reasonable range of alternatives as required by 40 C.F.R. § 1502.14(a); and (4) had a predetermined outcome and did not take a "hard look" at the foreseeable environmental effects of the change proposed.

Defendants reply that all of these assertions are incorrect. They contend that the Forest Service's action in approving the SEIS was not arbitrary and capricious.

The Court agrees with Plaintiffs on argument (2) and agrees with Defendants on arguments (1), (3) and a part of (4).

■ Regarding argument (2), the SEISs did not properly consider the regional supplement to Forest Service Manual § 2672 as part of its evaluation of Amendment 35 to the Ouachita Forest Plan. The Forest Service Manual supplement was a "connected action" and as such it had to be evaluated as part of Amendment 35's environmental analysis unless it fit within a categorical exclusion from NEPA requirements.

The October 2002 SEIS did recognize that in February 2002 the Forest Service had added a regional supplement (§ 2672.43) to the Forest Service Manual. The supplement consisted of the decision tree and a statement of policy regarding PETS population monitoring. However, the SEISs stated:

The issue [the regional supplement] is not an issue related to any environmental effect from the proposed action. There is already direction that the di-

rective system codifies the agency's policy, practice, and procedure. 36 CFR Part 200.4(b)(1) already states that

"directives are issued through the Forest Service Directive System, which is comprised of the Forest Service Manual and related Forest Service Handbooks. The Directive System codifies the agency's policy, practice, and procedure affecting more than one unit and the delegations of continuing authority and assignment of continuing responsibilities; serves as the primary administrative basis for the internal management and control of all programs; and is the primary source of administrative direction to Forest Service employees."

In response to the biologists' comment letter criticizing the proposed plan amendment and regional supplement to the Forest Service Manual, the Forest Service stated, "Forest Service Manual direction does not pertain to the scope of the proposal nor to the decision to be made by the Final Supplement to the Final Environmental Impact Statement Vegetation Management. Forest Service Manual changes are administrative changes." [AR 111, 211, 311]. Therefore, this Court concludes that the Forest Service did claim a categorical exclusion for the regional supplement to the Manual.

The regional supplement to the Manual was a connected action to the SEISs' revision of mitigation measure (2). Without the regional supplement's "decision tree", the revised language of mitigation measure (2) in Amendment 35 and the other 2002 forest plan amendments appears to state that the Forest Service can consider any amount of information (or lack of information) as sufficient in determining what species will be the subject of the biological evaluation. The decision tree adds struc-

ture to the decision-making process, such that field surveys must be conducted for PETS in certain situations which are identified through the decision tree process. The 2002 forest plan amendments and the 2002 decision tree were meant to go together.

While NFMA regulations do recognize the Forest Service Manual as a source of directive authority to Forest Service employees, and do allow regional supplements to the Manual, 36 C.F.R. § 200.4, the analysis of Plaintiffs' NEPA claim necessarily involves consulting NEPA requirements. Since 1983 the Council on Environmental Quality has invited federal agencies to identify types of actions which do not themselves impact the environment as "categorical exclusions"—actions which do not require environmental analysis prior to implementation. Guidance Regarding NEPA Regulations, 48 Fed.Reg. 34263, 34265 (July 28, 1983). Agencies are invited to submit lists of categorical exclusions to the CEQ for analysis and approval. *See* 40 C.F.R. § 1507.3(a); *see also* 48 Fed. Reg. at 34265. In 1991 the Forest Service submitted for consideration a list of proposed categorical exclusions. Notice of revised policy and procedures, 56 Fed.Reg. 19718 (April 29, 1991). The exclusions apparently were approved. They were adopted by the Forest Service in 1992. Notice of adoption of final policy, 57 Fed. Reg. 43180 (Sept. 18, 1992). The only category which comes close to fitting the regional supplement to the Forest Service Manual is the following: "Rules, regulations, or policies to establish [Forest] Service-wide administrative procedures, program processes, or instructions." 57 Fed. Reg. at 43208. The problem with relying on this exclusion, as Plaintiffs point out, is that by definition the regional supplement to the Forest Service Manual— § 2672.43—is not "Service wide". It applies only to Region Eight. Therefore, Defendants cannot rely on a categorical

exclusion to support the analysis in the SEIS and without it, the environmental analysis is flawed.

To be fair, the SEISs did consider the effect of the regional supplement's decision tree in discussing the change made by the SEISs and the 2002 forest plan amendments such as Amendment 35. [AR 313 at 20–22]. Also, the decision tree and the 2002 version of mitigation measure (2) read together are not much different from Amendment 31. Rather, they are a cleaner, restated version of Amendment 31. But the methodology of the SEISs as a whole was that the regional supplement to the Forest Service Manual was not itself a part of the environmental analysis. This was not the correct approach given that the regional supplement was not entitled to a categorical exclusion.

The Court agrees with Defendants on Plaintiffs' arguments (1), (3) and (4).

On argument (1), Plaintiffs' objection is based on a theory that the statement of purpose and need should have explained the factual background which led to the decision to add the supplements to the VMEIS. The part of the Supplement captioned "Purpose and Need" instead indicated that the supplement would not change the "Purpose and Need" of the original VMEIS. That was indeed correct. Nevertheless, the supplements also described, in the "preamble" and other sections, that the supplement was intended to delete the language of mitigation measure (2) pertaining to "population inventory information" and substitute new language which would make the VMEISs and the forest plans uniform in that regard. This approach was not arbitrary and capricious under the circumstances.

■ The Court finds that the decision to consider only two alternatives—the one actually adopted and a no-action alternative—was not arbitrary and capricious under the circumstances. There is no re-

quirement that more than two alternatives be considered in all cases. *See* 40 C.F.R. § 1502.14.

Plaintiffs' argument that the SEIS did not take a "hard look" at the foreseeable environmental effects of the change proposed and that the outcome was predetermined is largely rendered moot by the foregoing ruling on "connected actions". However, the Court will rule on two aspects of Plaintiffs' argument (4). First, the outcome of the analysis in the SEIS was not "predetermined". Plaintiffs' argument is that the SEIS was just a response to their previous argument regarding the insufficiency of Amendment 31 and other 2000 forest plan amendments, such that Defendants had to justify what already had been done with the 2000 amendments by supplementing the VMEISs with the SEISs. While Plaintiffs' complaint about the 2000 amendment process may have triggered the preparation of the SEISs, the SEIS's proposed change to the language of mitigation measure (2) in the 2002 forest plan amendments was different from that in the 2000 amendments. Therefore, a different environmental analysis was required and its outcome was not predetermined.[32]

■ Second, to the extent that Plaintiffs are arguing that the SEISs analysis was flawed for failing to anticipate the effects of all possible combinations of PETS species, vegetation management methods, mitigation methods, and project conditions, the Court disagrees. The SEIS gave numerous examples of how the Regional Supplement to the Forest Service Manual and the 2002 language of mitigation measure (2) would work together in cases involving different PETS in different situations and showed how PETS would not be harmed by the change. That was sufficient. NEPA only requires an analysis of foreseeable environmental effects; it does not require an analysis of all possible hypothetical effects. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Furthermore, the VMEIS and the SEIS established a framework (the site specific analysis including the biological evaluation) to determine future effects.

### III. *Claim III*

Plaintiffs contend they were deprived of the opportunity to file an administrative appeal objecting to deficiencies in the 1999 Revised Plan for the National Forests in Florida as well as in the 1999 Revised Plan for the Kisatchie Forest in Louisiana. They point out that, by Defendants' own admission, between the time the draft documents were provided to the public and the time the final documents were provided to the public, changes were made in the two plans of which no one was given any advance notice.

With respect to the 1999 Revised Kisatchie Forest Plan,[33] the final version of the

---

**32.** The Court further finds the question of whether the outcome was "predetermined" to be an improper approach to the question of whether the environmental analysis was adequate. It is the quality of the environmental analysis that counts.

**33.** The final 1999 Revised Kisatchie Forest Plan was an entirely new plan with a new environmental impact statement. The Plan stated that it "incorporates by reference the management direction and environmental analysis from [several] regional programmatic decisions", including the 1989 VMEIS for the Coastal Plain/Piedmont. [AR 712 at 1–2]. However, at 2–8 of the Plan, FW 009 stated the standard for biological evaluations which was similar to the Amendment 31 language.

The ROD for the 1999 Revised Kisatchie Plan [AR 713] then set out "Additional Decisions" which included revisions to the language of RODs of various environmental impact statements including the 1989 VMEIS. That revision was: "the appropriate methods of project level inventory/surveys for TES species when conducting biological evaluations

Plan incorporated language similar to that of mitigation measure (2) in Amendment 31 to the Ouachita Forest Plan discussed above. [AR 712 at 2–8]. The draft plan instead contained language more similar to that of the original version of mitigation measure (2) in the 1990 Ouachita Forest Plan. [AR 708 at 2–8]. None of the Plaintiffs filed an appeal.

With respect to the 1999 Revised Florida Plan [34] the facts are somewhat different. The Final Revised 1999 Plan for the National Forests in Florida contained language similar to mitigation measure (2) in Amendment 31 [AR 611 at 3–26] that was not in the draft 1999 Revised Florida Plan. [AR 608]. Indeed, the draft actually contained no language similar to any version of mitigation measure (2). [*See* AR 608 at 3–25]. Two of the Plaintiffs in this case, Biodiversity Legal Foundation and Florida Biodiversity Project filed an administrative appeal on August 4, 1999, objecting to the language at 3–26 of the final revised 1999 Plan. They contended it was inconsistent with NFMA, NFMA regulations, the Forest Service manual, the regional VMEIS and *Martin. See* [AR 616 at 3–8]. They also could have made an objection based on NEPA because they did receive the

final revised environmental impact statement. Florida Biodiversity Project and Biodiversity Legal Foundation did not make a NEPA claim. These parties were represented by Ray Vaughn, an attorney with Wildlaw, an environmental law firm. Plaintiff Sierra Club (Florida Chapter) also filed an administrative appeal on August 4, 1999, objecting to the final version of the 1999 Revised Florida Plan on numerous bases. None of the objections implicated the provisions for conducting biological evaluations at 3–26 of the Revised Plan either as an NFMA claim or a NEPA claim. However, Sierra Club (Florida Chapter) did intervene in the administrative appeal filed by Wildlaw on behalf of Biodiversity Legal Foundation and Florida Biodiversity Project. [AR 618]. Therefore, this Court infers that Sierra Club (Florida Chapter) did have knowledge of what was in the Florida Biodiversity appeal. The Forest Service rejected these claims in a consolidated appeal decision. [AR 618].

Defendants argue that any NEPA claims as to the 1999 Revised Plans are not viable because Plaintiffs failed to exhaust administrative remedies, as required by 7 U.S.C. § 6912(e). Plaintiffs argue

---

(page A–1, Section 1.A(2) of the VM ROD (FW 009, KNF Plan))." In other words, the ROD adopted the Amendment 31 version of mitigation measure (2).

The drafts of the Kisatchie Plan and draft environmental impact statement were dated November 1, 1997. The final Plan and final environmental impact statement were dated August 1999.

**34.** The 1999 Revised Florida Plan was an entirely new plan with a new environmental impact statement. In a section entitled "Relationship of the Forest Plan to Environmental Impact Statements" the Plan listed a number of environmental impact statements as "other decisions providing management direction." One was the ROD for the 1989 Coastal Plain/Piedmont VMEIS [AR 611, p. 1–2 as corrected by Docket # 337 filed January

17, 2008]. The 1999 Revised Florida Plan also noted on p. 1–3 "several exceptions to these Regional directions". One exception noted on page 1–3 was the following: "Direction is included in the Forestwide Standards and Guidelines (3–26) which clarifies the appropriate methods of project level inventory/surveys for TES surveys when conducting biological evaluations. This is a change in language found on page A–1, Section I.A.(2) of the Vegetation Management Record of Decision". The ROD for the 1999 Revised Florida Plan repeated the same language modifying previous RODs, including the change of language from the 1989 VMEIS for the Coastal Plain/Piedmont Region [AR 612 at 4–5]. In other words, the ROD adopted the Amendment 31 version of mitigation measure (2).

that the Court should excuse non-compliance with the exhaustion requirement because the changes made from the draft document were not provided in advance of the issuance of the final revised plans. Thus, they were not alerted to the fact that a change had been made.

■ While there is conflicting legal authority on this point, this Court concludes that it does have the power to excuse noncompliance with the exhaustion requirement of 7 U.S.C. § 6912. *See Bowen v. City of New York*, 476 U.S. 467, 482–83, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *Dawson Farms, LLC v. Farm Serv. Agency*, 504 F.3d 592, 597 (5th Cir.2007); *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 440 F.3d 992, 1000 (8th Cir.2006); *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 980 (9th Cir.2002); *Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974, 984–85 (9th Cir.2001); *Northwest Tissue Ctr. v. Shalala*, 1 F.3d 522, 530–31 (7th Cir.1993); *The Lands Council v. Vaught*, 198 F.Supp.2d 1211, 1241 (E.D.Wash.2002). *But see Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94–95 (2nd Cir.1998). The Court elects to do so in the case of the *Kisatchie* appeal, but not the *Florida* appeal. The record affirmatively suggests that Plaintiffs did have an adequate opportunity to object to the change in the Florida Plan; they actually did object. Plaintiffs have not provided any evidence to contradict this. In the case of the *Kisatchie* plan, the record lacks any indication that the change was actually noticed by Plaintiffs.

The Court turns to NEPA regulations to resolve the merits of Plaintiffs' NEPA claim as to the 1999 *Kisatchie* Plan. 40 C.F.R. § 1502.9(c)(1) provides that an agency:

(1) Shall prepare supplements to either draft or final environmental impact statement if: (i) the agency makes substantial changes in the proposed action

that are relevant to environmental concerns. . . .

■ As noted previously, NEPA is not substantive in nature. However, the Administrative Procedure Act ("APA") authorizes judicial review of final agency actions where a federal agency's action is "not in accordance with law". 5 U.S.C. § 706(2)(A). An agency's failure to provide appropriate notice to the public of contemplated action as required by NEPA is contrary to law and thus is redressable under APA. *See Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 953–54 (7th Cir.2000); *Sierra Nev. Forest Prot. Campaign v. Weingardt*, 376 F.Supp.2d 984, 990 (E.D.Cal.2005) ("An agency decision taken without the required procedure is 'contrary to law.'") (internal citations omitted).

■ Nonetheless, consistent with this Court's earlier finding that Amendment 31 was an insignificant amendment with no environmental impact, this Court determines that the Forest Service's failure to provide a revised draft of the 1999 Revised Kisatchie Plan and revised draft of its environmental impact statement did not violate NEPA or the Administrative Procedure Act. As noted above, the draft of the 1999 Kisatchie Revised Plan contained the original version of mitigation measure (2); the final version of the Plan contained Amendment 31's version of mitigation measure (2). The difference between the two versions of the Plan was not significant. The latter version did not make "substantial changes in the proposed action that are relevant to environmental concerns".

## IV.  SUMMARY

In accordance with the foregoing discussion, Plaintiffs' motion for summary judgment is DENIED as to Claim I; Defendants' cross-motion for summary judgment is GRANTED.

Regarding Claim II, the Court finds that the environmental analyses in those SEISs which supported the 2002 forest plan amendments were inadequate for the reason stated. Accordingly, the RODS for the three SEISs are VACATED and the 2002 plan amendments which depended on the RODs are SET ASIDE. This does not include Amendment 4 to the Forest Plan for the National Forests and Grasslands in Texas which has previously been set aside in *Sierra Club v. Jacobs*, Civil Action No. H–04–0374, U.S. District Court for the Southern District of Texas. It also does not include Amendment 18 to the Forest Plan for the National Forests in Alabama (Coastal Plain/Piedmont subregion) or Amendment 21 to the Forest Plan for the Chattahoochee–Oconee National Forests (Coastal Plain/Piedmont subregion); any claims against these amendments are moot. Thus, Plaintiffs' motion for summary judgment on Claim II is GRANTED and Defendant's cross-motion is DENIED.

As to Claim III, Plaintiffs' motion for summary judgment is DENIED and Defendants' motion for summary judgment is GRANTED. Plaintiffs' Claim III is DISMISSED IN PART for failure to exhaust administrative remedies (the Florida claim) and is otherwise DENIED ON THE MERITS (the Kisatchie claim).

Plaintiffs are directed to file a statement of the relief they seek with respect to Claim II. This statement must be forest-specific and project-specific. Plaintiffs should specify whether they seek relief as to work already under contract with a third party. If Plaintiffs contend that a partially completed project should be enjoined, Plaintiffs must describe with specificity what work is not completed and must address whether the public interest would be served by an injunction as to the remainder of that project. Plaintiffs' statement shall be filed within eleven (11) calendar days of date of this order.

Defendants shall file their response within eleven (11) *calendar days of filing of Plaintiffs' statement.* Defendants shall state any and all objections they may have to any of the relief sought by Plaintiffs with the same level of specificity as that required of Plaintiffs.

Plaintiffs may file a reply within five (5) *calendar days after filing of Defendants' brief.*

If either side wishes oral argument or an evidentiary hearing on the issue of remedy, it should so state. If an evidentiary hearing is desired, specify what evidence would be presented. The parties are notified that the date for such evidentiary hearing (if a hearing is held) will be April 8, 2008, at 11:00 a.m.

# APPENDIX

**FOREST SERVICE MANUAL**
**SOUTHERN REGION (REGION 8)**
**ATLANTA, GA**

**FSM 2600—WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT**

**CHAPTER 2670—THREATENED, ENDANGERED, AND SENSITIVE PLANTS AND ANIMALS**

**Supplement No.:** R8–2600–2002–2

**Effective Date:** The Directive Manager completes this field.

**Duration:** This supplement is effective until superseded or removed.

**Approved:** ROBERT T. JACOBS                 **Date Approved:** 02/13/2002
Regional Forester

**Posting Instructions:** Supplements are numbered consecutively by title and calendar year. Post by document; remove the entire document and replace it with this supplement. Retain this transmittal as the first page(s) of this document. The last supplement to this title was R8–2600–2002–1 to FSM 2600.

| New Document | 2670 | 5 Pages |
|---|---|---|

| Superseded Document(s) by Issuance Number and Effective Date | 2670 R8–2600–2002–1 February 15, 2002 | 1 Page |
|---|---|---|

**Digest:**

2672.43—Provides guidance to aid in determining when project-level inventory of Proposed, Endangered, Threatened, and Sensitive (PETS) species is necessary. The inventory is only one step of the Biological Evaluation (BE) process. This step does not supercede any of the requirements for project-level Biological Evaluations established in the 2672.4 section of the Forest Service Manual (FSM).

There are important differences between project-level inventory and forest-level population monitoring.

R8 SUPPLEMENT
EFFECTIVE DATE:
DURATION: This supplement is effective until superseded or removed.

2670
Page 2 of 5

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED, AND SENSITIVE PLANTS AND ANIMALS

**Digest:** (Continued)

Project-level inventories are conducted to gather information on distribution and numbers of individuals within the area affected by a project. Project-level inventory is usually conducted on a small scale and is used for the detection of PETS species. When properly designed, population monitoring strategies may include project-level inventory data. However, the summation of project-level inventories does not constitute population monitoring. Project-level inventories are not intended to replace forest-level monitoring obligations under FSM 2670.45.

Population monitoring is conducted to gather information on distribution and numbers of individuals within a national forest. Population monitoring is usually conducted on a larger scale and is used to detect change in population size.

Standardization of monitoring and inventory methods is desirable to reflect population trends within and among populations between observers, over time, to achieve repeatability and consistency. The Forest Service Handbook is being supplemented to identify techniques for inventory and monitoring of proposed, endangered, threatened, or sensitive species or species groups.

R8 SUPPLEMENT
EFFECTIVE DATE:
DURATION: This supplement is effective until superseded or removed.

2670
Page 3 of 5

FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT
CHAPTER 2670 – THREATENED, ENDANGERED, AND SENSITIVE PLANTS AND ANIMALS

## 2672.43—PROCEDURES FOR CONDUCTING BIOLOGICAL EVALUATIONS

Procedure for Determining When Project-level Inventory for Proposed, Endangered, Threatened, or Sensitive Species is necessary.

Exhibit 1 outlines a procedure for determining when project-level inventory for proposed, threatened, endangered, or sensitive species is necessary.

| R8 SUPPLEMENT | 2670 |
|---|---|
| EFFECTIVE DATE: | Page 4 of 5 |
| DURATION: This supplement is effective until superseded or removed. | |

**FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 2670 – THREATENED, ENDANGERED, AND SENSITIVE PLANTS AND ANIMALS**

### 2672.43 - EXHIBIT 1

**Project-Level**
**Proposed, Endangered, Threatened, and Sensitive Species**
**Inventory Tree**

| | | |
|---|---|---|
| Does the species have potential to occur in the area affected by the project, based on range and habitat information? | No → | Site-specific inventory is not needed. Document sources of information. |

↓ Yes or Unsure

| | | |
|---|---|---|
| Is the project expected to have no effects or totally beneficial effects[1] regardless of the number or location of individuals in the area affected by the project? | Yes → | Assume species is present and analyze expected effects. |

↓ No or Unsure

| | | |
|---|---|---|
| Would information on number and location of individuals improve design and/or application of mitigation to reduce adverse effects,[2] or allow better assessment of effects to viability of the population? | No → | Assume species is present and analyze expected effects. |

↓ Yes or Unsure

| | | |
|---|---|---|
| Is the species already covered by a current site-specific inventory[3] for the area affected by the project? | Yes → | Additional site-specific inventory is not necessary. Use existing inventory information to analyze expected effects. |

↓ No or Unsure

| | | |
|---|---|---|
| Are inventory methods feasible[4] and effective for providing substantial information on number and location of individuals? | No → | Assume species is present and analyze effects. Document why inventory is not feasible in the Biological Assessment or Biological Evaluation[5] |

↓ Yes

| |
|---|
| Site-specific inventory is needed. Conduct such inventories before analyzing effects. |

R8 SUPPLEMENT
EFFECTIVE DATE:
DURATION: This supplement is effective until superseded or removed.

2670
Page 5 of 5

**FSM 2600 – WILDLIFE, FISH, AND SENSITIVE PLANT HABITAT MANAGEMENT**
**CHAPTER 2670 – THREATENED, ENDANGERED, AND SENSITIVE PLANTS AND ANIMALS**

### 2672.43 – EXHIBIT 1 – Continued

FOOTNOTES TO EXHIBIT 1

[1] Beneficial Effect: Those effects of an action that are wholly positive, without any adverse effects on species federally listed as proposed, endangered or threatened, or their designated critical habitat, or species listed as sensitive by the Regional Forester.

[2] Adverse Effect: Those effects of an action that have an apparent direct, indirect, or cumulative negative effect on the conservation and/or recovery of a species federally listed as proposed, endangered or threatened, or their designated critical habitat, or listed as sensitive by the Regional Forester.

[3] Current Site Specific Inventory: A site-specific inventory that is deemed up-to-date for effects analysis purposes. The time frame an inventory would be deemed current depends on the species involved. Highly mobile species with greater dispersal abilities would need to be inventoried more often than non-mobile species. Inventories must have been conducted at the appropriate season to determine presence of a given species.

[4] Feasible Inventory: An inventory that is both technically and biologically feasible. Technical feasibility means the technology and methodology currently exist to effectively and efficiently inventory for a given species. Biological feasibility means the species biology renders it to be effectively and efficiently sampled. Feasibility is in no way influenced by manpower, expertise within the agency, or funding beyond the requirement that an inventory be effective and efficient.

[5] Biological Evaluation: A Forest Service process to analyze potential effects of agency actions on proposed, endangered, threatened, and sensitive species. The effects analysis can be documented in two ways. A "Biological Assessment" is prepared to disclose potential effects on proposed, endangered, or threatened, species or designated critical habitat. If any effects are expected, Endangered Species Act Sec 7(a) 2 consultation must occur. A "Biological Evaluation" is prepared to disclose potential effects on Forest Service sensitive species. This is part of the Forest Service sensitive species policy.

## APPENDIX

### LIST OF 2002 REGION EIGHT FOREST PLAN AMENDMENTS

[AR 114]   Appalachian Mountains Subregion

National Forests in Alabama—Amendment 19

George Washington National Forest—Amendment 9

Jefferson National Forest—Amendment 8

Chattahoochee–Oconee National Forest—Amendment 20

Cherokee National Forest—Amendment 28

Daniel Boone National Forest—Amendment 13

Nantahala/Pisgah National Forest—Amendment 14

Sumter National Forest—Amendment 16

[AR 214]   Coastal Plain/Piedmont Subregion

National Forests in Florida—Amendment 1

Kisatchie National Forest—Amendment 1

Chattahoochee–Oconee National Forests—Amendment 21

National Forests in Alabama—Amendment 18

Croatan–Uwharrie National Forests—Amendment 6

Francis Marion National Forest—Amendment 1

National Forests in Mississippi—Amendment 16

National Forests and Grasslands in Texas—Amendment 4

Sumter National Forest—Amendment 15

[AR 314] Ozark/Ouachita Subregion

Ouachita National Forest—Amendment 35

Ozark–St. Francis National Forest—Amendment 12

### CLAIMS MADE IN *CHATTOOGA CONSERVANCY* and *FOREST CONSERVATION*

In *Chattooga Conservancy* case, Plaintiffs made the following claims:

Count I: Claim that Defendants violated the Administrative Procedure Act ("APA") by ignoring the PETS data collection requirement in the 1990 Ozark/Ouachita Vegetation Management Environmental Impact Statement ("VMEIS").

Count II: Claim that Defendants violated the National Environmental Protection Act ("NEPA") and the APA by failing to supplement the 1990 Ozark/Ouachita VMEIS before amending the 1990 Ouachita Forest Plan to delete Amendment 3 and add Amendment 31 in 2000; also, the environmental assessment for Amendment 31 was deficient because it failed to address the inconsistency between Amendment 31 and the 1990 VMEIS. This count makes parallel claims regarding the adoption of Amendment 17 to the forest plan for the National Forests in Alabama and Amendment 18 to the forest plan for the Chattahoochee–Oconee National Forest in Georgia.

Count III: Claim that Defendants violated the National Forest Management Act ("NFMA") and NEPA by failing to prepare an environmental impact statement, as opposed to just an environmental assessment, for Amendment 31 to the Ouachita Forest Plan.

Count IV: Claim that Defendants violated NEPA and the APA by-adopting 1999 revised forest plans for the National Forests in Florida and the Kitsachee National Forest in Louisiana which changed the PETS inventory requirements without mentioning the change in the draft revised forest plans and the draft environmental impact statements.

Count V: Claim that Defendants violated NEPA and the APA by preparing environmental assessments for forest plan amendments in such a way that public participation was excluded.

Count VI: Claim that Defendants violated NEPA and the APA because the process by which the Supplements to the 1990 VMEISs for the Ozark/Ouachita, Appalachian and Coastal Plain/Piedmont regions were adopted was arbitrary and capricious in that the Supplements failed to state their purpose; failed to address related actions; considered an inadequate range of alternatives; and generally failed to take a "hard look" at foreseeable environmental impacts.

Count VII: Claim that the Wildhorse Creek and Oliver Branch projects violated NFMA and NEPA because they were approved pursuant to Amendment 31 of the Ouachita Forest Plan and also because there was inadequate PETS data and Management Indicator Species (MIS) data for the Forest and for the two project areas.

In the *Forest Conservation Council* case, Plaintiffs made the following claims:

Count I: Claim that Defendants violated NFMA regulations concerning MIS because Defendants implemented the Ouachita Forest Plan without gathering, keep-

ing current, and considering quantitative data and trend data on all MIS.

Count II: Claim that Defendants violated NFMA by failing to collect required quantitative data for MIS as required by the Ouachita Forest Plan.

Count III: Claim that Defendants violated NFMA by approving five projects in the Ouachita National Forest[1] despite the absence of "adequate population inventory information" for PETS species in both the forest as a whole and the project sites; Defendants violated NEPA by failing to prepare environmental impact statements for amendments to the 1990 Ouachita Forest Plan; the amendments were inconsistent with the 1990 Ozark/Ouachita VMEIS; the 2002 Supplement to the Ozark/Ouachita VMEIS violated NEPA because it did not take a "hard look" at the environmental effects of the supplement.

Count IV: Claim that five projects in the Ouachita National Forest violated NFMA because of inadequate population inventory information on PETS and insufficient quantitative data on MIS; thereby triggering a NEPA violation under 40 C.F.R. § 1508.27(b)(10).

Summary judgment was granted in Defendants' favor on all claims in June 2005.[2] Plaintiffs appealed all of this Court's rulings, but elected to abandon some claims on appeal.

---

1. Originally Count III challenged the approval of 32 projects in four states (Arkansas, Mississippi, Texas and Virginia). By order of December 18, 2003, severance was granted as to the Mississippi, Texas and Virginia projects.

2. The basis for some of the rulings was that Plaintiffs had failed to exhaust administrative remedies; some claims were dismissed for lack of ripeness and other claims were adjudicated on the merits.